[L. A. No. 16445. In Bank.—November 16, 1938.]

META LONG, Respondent, v. HENRY C. RUMSEY, as Executor, etc., Appellant.

George W. Downing, Jr., and Carey McWilliams for Appellant.

Fall & Fall and W. Bobbitt, as *Amici Curiae,* on Behalf of Appellant.

Edwin J. Miller and Ralph W. Miller for Respondent.

BARNARD, J., *pro tem.*—This is an action for the reasonable value of services alleged to have been performed by the plaintiff, a claim therefor having been filed with the executor of the estate of Ida Fricke and rejected.

Ida Fricke and her husband, August Fricke, ran a bakery in Los Angeles, and lived in the same building. A cousin of Mrs. Fricke, Meta Klatt, who was then seventeen years of age, arrived in Los Angeles on March 23, 1913, and thereafter, for a period of about six years, lived with the Frickes

and assisted them in the work of the bakery and the home. She was married to a Mr. Long on February 28, 1918, but continued her work at the bakery until June 1, 1919, when her husband returned from the war, at which time they went to housekeeping and the services in question were discontinued. August Fricke died in 1927, and Ida Fricke died in 1935, her estate being appraised at $30,013.63, with a net value of $23,500. Her will made no provision for Meta Long, and this action followed.

The complaint alleged that pursuant to a letter she received the plaintiff arrived in Los Angeles on March 23, 1913, and that on that day Mr. and Mrs. Fricke "entered into an oral agreement with claimant, which said contract and promises were reiterated and restated by said August Fricke and Ida Fricke many times thereafter, whereby they orally covenanted and agreed with claimant that if she would perform said work and services, and work in their bakery and in their home as should be required by them, for as long as they desired her to do so, that instead of paying her in cash during said employment the prevailing and current wages therefor, that they, or the survivor of either, would leave to claimant by deed or will all the property of which they, or the survivor of either, should die possessed, as compensation to her for the performance of said services; and that in order to further induce claimant to perform said services for them, and to assure claimant that she would be compensated for said services in the manner aforesaid, the said August Fricke and Ida Fricke, and each of them, covenanted and agreed with claimant that they would legally adopt her, and make her their sole legal heir".

It is then alleged that the plaintiff performed all of the labor and services required of her under said oral agreement; that her term of service terminated on or about May 1, 1919, with the consent and approval of Mr. and Mrs. Fricke; that they failed to legally adopt her; and that the reasonable value of the services so performed was $30,013.63.

At the trial, the following evidence was received: A Mrs. Greiler testified that she worked for the Frickes in their bakery in March, 1913, and intermittently until 1917; that Mrs. Fricke told her she had a cousin, Meta Klatt, who was one of a family of ten or eleven children whose financial condition was not the best, and that she would like to have

this girl come to Los Angeles, "to work for her, to make it her home"; that the Frickes were German and could not write English, and at their request she wrote a letter to Meta Klatt; that the letter contained just a few words asking her if she would like to come to Los Angeles "and if she would like to make this her home"; that in a few days the Frickes told her they had had a reply; that at their request she bought a money order for enough to cover the railroad fare and wrote a second letter sending the money order to Meta Klatt in Wisconsin; that in about three weeks Meta Klatt arrived in Los Angeles; that they introduced her to Meta and Mrs. Fricke said she was going to be their adopted daughter; that three weeks later Mrs. Fricke gave birth to a child which lived only three days, and they never had any other children; that she saw Meta working around the bakery from 1913 until 1919; that once in a while Meta would complain that the work was heavy and Mr. Fricke or Mrs. Fricke would say that she should not mind that because she was young; that at other times when she complained they said "Never mind, Meta, it is for your interest as well as for ours. When we both are dead and gone, everything will be yours"; that she heard them say this many times over a period of four years; that on one occasion she heard Mr. Fricke say that "he went down to get adoption papers, but they were refused on account of him not having his citizen papers"; that she later heard Mrs. Fricke say she would like to adopt Meta as they had nobody here at the time and she was working very hard and "of course it was for her interest as well as for theirs"; that they bought her clothes and gave her spending money; that a few months after Meta came Mrs. Fricke asked her to take Meta down town and buy her a dress saying, "You know, we are just giving Meta spending money and buying her clothes, but there is no salary"; that Mrs. Fricke said: "We are not paying Meta any wages. We are all working hard here and someday all of this will be hers"; that in 1918 Mr. Fricke said there was a rumor around that he was working Meta too long hours and that if anyone from the labor commission came to investigate "you tell them that she is our adopted daughter; this is her home, and she is not on no salary"; that they repeated many a time that they would provide for her; that about two years after Meta came she packed her clothes and went to the home of a friend of the witness; that

she had a conversation with Mr. Fricke in German in which Mr. Fricke asked her to persuade Meta to come back saying, "We need her. She would be very foolish if she didn't come back because some day everything will be hers, all property after we are both dead and gone"; that she told Mr. Fricke he should put that in writing and he replied "We have plenty of time, time enough when we are ready to die"; that she then told Meta to go back and try it over again which she did; that at that time Meta said she could not do enough for them and Mr. Fricke replied: "Well I know it is hard work, but it is for your interest as well as for ours"; that Mr. and Mrs. Fricke were in favor of Meta's marriage to Mr. Long and Mr. Fricke bought her wedding trousseau and also gave her a wedding dinner; that after the wedding Mr. Fricke asked Mr. Long if Meta could continue to work and Mr. Long replied that she could until he came back from the war; and that after the marriage Meta continued to work for about a year.

A Mrs. Duby testified that she was working at the bakery when Meta came; that Mrs. Fricke introduced her saying "This is Meta" and told her to show Meta what work was to be done; that she heard her mother complain to Mr. Fricke that the work was too hard for Meta and Mr. Fricke replied: "She is a young girl and she ought to be able to stand it. In Germany we work much harder. She does not have to worry, if she is good to us she will get everything we have"; and that she frequently heard Mr. and Mrs. Fricke say that they would see that Meta was always provided for and would get all "especially after papa died". When asked if she had heard any conversation when Meta first came, concerning whether or not they were to pay any wages for her work, the witness replied that shortly after the girl arrived "they said they would provide for her, buy clothes for her, and give her some spending money". When asked if she had ever heard any conversation about adopting Meta the witness said that this conversation came up quite frequently after the baby died and the Frickes said "that their baby was dead now, and they thought Meta was a good girl, and they would adopt her". She further testified that the Frickes were enthusiastic about Meta's marriage to Mr. Long, that they made big preparations, bought her a "lovely outfit" and had a big dinner; that after the dinner Mr. Fricke said to Mr.

Long, "Meta has been a good girl to me. I want you to take good care of her"; that Meta continued to work in the bakery while Mr. Long was in the service; and that she left and went to housekeeping when he returned.

A Mr. Hermans testified that more than once he heard Mr. Fricke say that Meta would not regret her work, that he intended to reward her for it. Mr. Long testified that when he asked Meta about marriage she told him he would have to talk to Mr. and Mrs. Fricke "as I am making my home with them; I am the same as one of the family"; that when he asked Mr. and Mrs. Fricke for her hand they replied: "She is our girl, we think just as much of her as if she were ours"; that they asked him if she could "continue to stay with us as she has been before" while he was away in the service, to which he gave his consent; that before the marriage Mr. Fricke said to him, "You ought to be able to take care of her. If you don't, she will always have a home with us" and then stated that he would give a dinner and see that she had nice clothes for the wedding, "which he did"; that after the wedding Mr. Fricke said to him "Meta can continue to stay with us, as I told you before. We will take good care of her, I will assure you of that. If you don't return, she will always be our girl, and she can make her home with us"; that he returned from the war on June 1, 1919, and he and his wife went to housekeeping; that they visited the Frickes frequently until Mr. Fricke's death in 1927, after which they continued to visit Mrs. Fricke; that she frequently praised Meta and said, "She don't have to worry, she will be well taken care of when we are dead and gone"; that on one occasion, in talking about the death of another person, Mrs. Fricke said: "When I go I am going to make a provision so that I will carry out my promises; it will go to those who helped earn it"; that on another occasion she said to him "You have always provided well for Meta, I will take care of her some day, she has it coming"; and that in 1922 Mr. Fricke asked him if Meta might come down and "give them a hand" two or three days a week, to which he consented.

Another witness testified that for several months in 1922 Meta worked in the bakery three days a week and was paid in cash each Saturday night, receiving the same wages as other workers. And another testified that shortly before her death

Mrs. Fricke told him that Meta was her adopted daughter; that she had brought her from the middle west and she had worked in the bakery; that they had clothed and fed her and given her some little spending money; and that "they had promised her that when they both passed away she would be in the will to receive her part of the estate, which was—she waved her hand—she said 'You know half of this belongs to Meta Long, she helped us in every way, and she worked for us all these years, and she never got anything for it except the little spending money we gave her' ".

A jury awarded the plaintiff $11,750, which happens to be one-half of the net value of the estate, as shown by the evidence. The defendant has appealed from the judgment which followed, and from an order denying a motion for a judgment notwithstanding the verdict.

■ The alleged oral contract to compensate the respondent by leaving her the entire estate upon the death of the Frickes is unenforceable (sec. 1624, Civ. Code; sec. 1973, Code Civ. Proc.), and a recovery, if any, must be based upon the theory of *quantum meruit*. The main question presented is whether or not such an action is barred by the statute of limitations, it being conceded that the last services under the alleged contract were performed some sixteen years before the death of Mrs. Fricke. The appellant contends that where continuous services are performed under a contract which is unenforceable under the statute of frauds, the law implies a promise to pay the reasonable value thereof at the termination of the services, at which time the statute of limitations begins to run. The respondent's position is that the services were rendered under an agreement to convey or devise all of the property owned by the testatrix at her death; that this express agreement, although it could not be specifically enforced, was voidable only and until repudiated or breached, was valid and subsisting; that the law will not imply a promise when there is a subsisting express promise but will wait until the same has been repudiated or breached by the promisor; that upon such breach the law implied a promise to pay the reasonable value of what had been received under the agreement; and that the cause of action then arose and the statute of limitations began to run.

While a contract of this nature is unenforceable, recovery from the estate for services rendered to a decedent has frequently been permitted in this state in an action upon *quantum meruit*. (*Mayborne* v. *Citizens T. & S. Bank*, 46 Cal. App. 178 [188 Pac. 1034]; *Warder* v. *Hutchison*, 69 Cal. App. 291 [231 Pac. 563]; *Lauritsen* v. *Goldsmith*, 99 Cal. App. 671 [279 Pac. 168]; *Burr* v. *Floyd*, 137 Cal. App. 692 [31 Pac. (2d) 402]; *Zellner* v. *Wassman*, 184 Cal. 80 [193 Pac. 84]; *Seib* v. *Mitchell*, 10 Cal. App. (2d) 91 [52 Pac. (2d) 281]; *Estate of Rohrer*, 160 Cal. 574 [117 Pac. 672, Ann. Cas. 1913A, 479]; *Robinson* v. *Chapman*, 98 Cal. App. 278 [276 Pac. 1081]; *Wax* v. *Adair*, 16 Cal. App. (2d) 393 [60 Pac. (2d) 904]; *Turell* v. *Anderson*, 16 Cal. App. (2d) 445 [60 Pac. (2d) 906].) In many of these cases, where the services were continuous, it was held that the statute of limitations did not begin to run until the termination of the services. In some of them language is used to the effect that under the circumstances there existing the law will imply a promise to pay the reasonable value of the services rendered when an express promise to compensate by will has failed of fulfillment. It happens, however, that in each of these cases the termination of the services coincided with the death of the employer.

The cases permitting recovery on *quantum meruit* for services performed over a period of years which continued up to the death of the promisor were cases where the circumstances justified the inference that it was the intention or expectation of the parties that the services were to be rewarded when terminated. These cases are largely based upon the rule that where the contract is for an indefinite time and no time for payment is specified the statute does not begin to run until the services end. Under well-established principles the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered. One circumstance which naturally tends to indicate such a situation is the fact that increasingly onerous services are rendered to a person in his declining years by one under no obligation to do so. It may be observed that it would be equally in accord with common experience to regard the fact that a youth makes his home with and renders service of a general nature to an able-bodied relative as much less persuasive in that regard.

█  It may be taken as established by these cases that ordinarily a promise to pay the value of such services is implied by law at the termination thereof, and that the statute of limitations then begins to run. The respondent argues that a different rule prevails where the parties have expressly agreed upon a time for payment which is subsequent to the completion of the services, in which case the implied promise to pay the value and the cause of action do not arise until the contract is broken. In effect, the contention is that such a situation constitutes an exception to the usual rule and delays the running of the statute until the breach of the contract.

Under the facts here appearing it is unnecessary to decide the question of law suggested by the respondent, or as to whether such an exception to the usual rule should be established. If the rule be as she contends she must still bring herself within it. Assuming, but not holding, that the respondent's contention is correct it presupposes the making and continued existence of an express contract calling for payment at such a future time. The existence of the express contract would have to be proved, which would necessarily require evidence of a more convincing and definite character than that sufficient to show, merely, that the services were not gratuitously rendered. In the cases heretofore cited, where the services were continuous up to the time the supposed contract was breached, it was not only unnecessary to rely on any express contract but it was not necessary that the evidence be sufficient to establish a contract since the promise to pay at the termination of the services, implied by law, was sufficient. "Under this test the claimant is not required to prove any express contract, but it is sufficient if from the facts and circumstances it reasonably can be inferred that compensation was in the view and contemplation of the parties." (*Mayborne* v. *Citizens T. & S. Bank, supra.*) While it was held in some of those cases that evidence similar in some respects to that found here was sufficient to justify the inference that the services were not gratuitously rendered and to support an implied promise to pay the value thereof at their termination, it does not follow that such evidence is sufficient to establish the existence of an express contract to pay at a future time.

In *Monsen* v. *Monsen,* 174 Cal. 97 [162 Pac. 90], it is said: "It may not be amiss to point out the manifest danger of fraud, perjury, and injustice that may inhere in a recognition of the right to alter, by parol testimony, the course of disposition of the property of a decedent." The statutes which prevent the direct enforcement of the contract here relied upon were adopted for the purpose of removing at least a part of that danger. ■ While there may be equitable grounds for permitting recovery of the value of services shortly after their termination, in the absence of a written contract, the rules and the opportunity to evade the statute should not be unduly extended. Before these statutes were adopted an agreement to leave property by will could be enforced in equity but only upon clear, definite and satisfactory proof. (*Monsen* v. *Monsen, supra.*) Much of the danger which has been referred to would still exist if claims based upon an alleged oral contract are permitted to be raised many years after the services were completed. If this should be allowed at all, the rules of the former equity cases requiring clear and satisfactory proof of the contract should be continued and applied, since it involves, in effect, specifically enforcing that part of the contract which fixes the date of payment. If the breach of the supposed contract is relied on in order to avoid the bar of the statute of limitations, which would otherwise apply, the terms of the contract must be proved in order to establish that a breach has occurred. The law cannot imply the essential terms of the contract in order to determine whether or not it has been breached, and then imply a promise to pay at the later date merely because originally the services were not gratuitously rendered. ■ The only promise implied by law is a promise to pay based upon the equitable doctrine that the promisor, having received the benefit, should pay its reasonable value. A promise to pay at some time to become fixed in the future must be based upon the agreement of the parties and not upon a rule of law. It follows that, in any event, it was incumbent upon this respondent to clearly and definitely prove an express contract to pay for certain services at a future time. ■ Even if an oral contract, required by the statute to be in writing, is voidable only and is to be considered effective until its enforcement is voided upon the ground that it is not in writing, it must be otherwise unob-

jectionable in all respects and must conform to the requirements of a contract. (*Producers Fruit Co.* v. *Goddard,* 75 Cal. App. 737 [243 Pac. 686].) In *Spinney* v. *Downing,* 108 Cal. 666 [41 Pac. 797], one requirement is thus stated: "It is essential to the existence of every contract that there should be a reciprocal assent to a definite proposition."

The complaint here, after stating that the respondent came to Los Angeles in response to a letter from the Frickes requesting her to come and work for them, alleges the making of a definite agreement in advance that she would work in their bakery and in their home "as long as they desired her to do so", and that as compensation therefor they would leave to her by deed or will all of the property of which the survivor of them should die possessed, and that for the purpose of insuring this result they would legally adopt her and make her their sole heir. Turning to the evidence we find nothing of such an express contract before the services began, which is not surprising in view of the fact that the Frickes were expecting the birth of a child which was born some three weeks later. There is no evidence that anything was said in advance as to how long she should work and no evidence about anything being said at any time about her working as long as they desired. The only evidence of any definite thing being said at the beginning of her service is that shortly after she arrived the Frickes told her they would provide for her, buy her clothes and give her spending money.

No definite agreement is shown during the first two years, after which the respondent left the home saying she was unable to do enough to please the Frickes, which tends to indicate that she was not then relying on an express agreement. Mr. Fricke's only reply to the respondent was "It is for your interest as well as for ours." While he then told another party that Meta would be foolish if she did not come back because some day everything would be hers that conversation was in German and it is not even shown that the respondent understood it or that it was translated for her. When her hand was asked in marriage, instead of saying that she had a contract from which she must be released she told Mr. Long he would have to talk to the Frickes as she was making her home with them and was the same as one of the family. When his permission for the marriage was asked

Mr. Fricke did not mention any agreement for her services, and his only concern was whether her prospective husband could take good care of her. Although he still desired her services during her husband's absence, he did not assert a contractual right thereto but asked permission for her to remain, promising to take good care of her if her husband did not return. When she left and went to housekeeping in 1919 nothing was said about her services being no longer desired and there is nothing to indicate any understanding at that time that the services she had already performed were to be taken as full performance on her part of an existing contract. It is significant that when her services were later desired the parties did not proceed in accordance with any such contract as is alleged but the permission of the respondent's husband was asked and she was paid regular wages.

While the Frickes treated the respondent like a member of the family as long as she remained with them and while the evidence justifies the inference that for a time they intended to adopt her it does not disclose an agreement to do so, and they never did. While they talked on a number of occasions about leaving all of their property to her these statements seem to have been made, largely if not entirely, at a time when such adoption was possible, and are consistent with such an intention. It can hardly be said that the evidence shows either an express agreement to leave her all of their property in return for any definite amount of service, or that any such specific service was rendered as a result of or in reliance upon such a promise. Although Mr. Fricke lived nine years after the marriage there is a noticeable absence of any testimony showing any recognition of such a contract on his part during that time. While Mrs. Fricke, during the last years of her life, did mention leaving something to the respondent, the evidence as to this is not only indefinite but considerably at variance with the claimed agreement to leave her all of the remaining property. At one time she said her property would ''go to those who helped earn it'', and at another she stated that Meta would ''be in the will to receive her part of the estate'', and that ''half of this belongs to Meta Long'', waving her hand at something.

It can neither be told when a contract was made, how much service was to be performed, or what the future compensation

was to be. The evidence is not sufficient to show that the minds of the parties met at any time on a definite agreement for the rendering of services which should be compensated for at the death of the Frickes. The following language from *Monsen* v. *Monsen, supra,* is applicable here:

"All of this evidence is similar in character to that under consideration in *Ackerman* v. *Ackerman's Exrs.,* 24 N. J. Eq. 585, 586 (cited with approval in *Owens* v. *McNally,* 113 Cal. 444, 33 L. R. A. 369 [45 Pac. 710]), of which the court said 'the complainant's evidence chiefly consists of loose conversations had by different persons with the testator . . . all of which evidence is consistent with a purpose, at one time, on the part of the father, to devise the farm to Gilbert and Gilbert's expectation that he would . . . but which fails to show any contract for the conveyance or devise of the farm, intended to be obligatory either upon the father or son'."

A further consideration is that if any such contract as the one alleged ever existed it is not shown that it continued until the death of Mrs. Fricke. Any agreement to adopt the respondent was broken some time in 1917 when she became of age. If the agreement to leave her all of their property as compensation for her services "as long as they desired" still remained, something later happened to that. She left in 1919 and thereafter, although they still wanted her services, at least at times, they paid her and she accepted regular wages. So far as appears from the evidence they entered into a new arrangement, saying nothing about any previous contract. The subsequent conduct of the parties is inconsistent with the continuance of the asserted contract, in the absence of evidence to show that certain rights had accrued thereunder and were to be preserved, and indicates that if such a contract ever existed it was abandoned. (*Klein Norton Co.* v. *Cohen,* 107 Cal. App. 325 [290 Pac. 613]; *Treadwell* v. *Nickel,* 194 Cal. 243 [228 Pac. 25].)

The evidence not being sufficient to meet the test above set forth, any cause of action resting upon an implied promise to pay the value of the services rendered arose at their termination. This action, having been brought more than sixteen years later, was barred by the statute of limitations. This defense was raised and should have been sustained.

The judgment and order appealed from are reversed with directions to the trial court to enter judgment in favor of the appellant.

Langdon, J., Edmonds, J., Curtis, J., Shenk, J., Waste, C. J., and Seawell, J., concurred.

Rehearing denied.