[Civ. No. 12965. First Dist., Div. One. Dec. 28, 1945.]

NINA MOORE, Respondent, v. RISTO SPREMO et al.,
as Executors etc., Appellants.

Marion Vecki and Chalmer Munday for Appellants.

Fred A. Watkins and John D. Costello for Respondent.

WARD, J.—The defendants, as executors of the last will and testament of Rade Babich, deceased, appeal from a judgment in favor of plaintiff on claims against his estate for room rent and work and labor performed for the decedent.

The complaint was framed in four causes of action: (1) For room rent from January 15, 1930, to February 7, 1944, at

the rate of $15 a month pursuant to an oral agreement; (2) for personal services, including cooking and nursing, at the instance and request of decedent, covering a period of four months at $150 a month; (3) for personal services of a similar but less onerous character covering a period of nine months at $75 a month; and (4) services for nursing, etc., from December 21, 1943, to the date of death of Rade Babich, February 7, 1944, in the sum of $300. The court found in accordance with the material allegations of the amended complaint in favor of the plaintiff on each cause of action.

The main question to decide is the sufficiency of the evidence to support the findings. Appellants present the ''Question Involved'' as follows: ''Whether, in the first place, there is any evidence at all in the record which will sustain the allegations of the amended complaint with reference to the first cause of action that the room in question was occupied by the decedent, Rade Babich, 'under and pursuant to an oral agreement with plaintiff made and entered into between said plaintiff and said deceased, on or about the said 15th day of January, 1930, by which said decedent agreed to compensate plaintiff at the rate of fifteen ($15.00) dollars a month for said room, at such time as decedent should cease to occupy said room,' and the findings made in accordance with the said allegations; and in the second place, whether there is any evidence at all in the record which will sustain the allegations of the amended complaint with reference to the second, third and fourth causes of action and the findings made in accordance therewith, that the services therein mentioned were rendered under and pursuant to 'an oral promise by the decedent to pay plaintiff the reasonable value thereof when said services should have been completed,' or that such services were rendered by plaintiff 'with the expectation and agreement that the same should be paid for by said decedent when terminated.' ''

The evidence shows that Rade Babich came to live in the plaintiff's rooming house in 1928. In 1930, during the depression, she permitted him to stay on in his room without paying rent. In 1933 or 1934 he admitted to Harry G. Selig, one of his friends, that he owed Mrs. Moore, the plaintiff, a great deal of money; in 1937, the deceased stated to Selig that if she didn't get paid the amount she was owed, his will would take care of her, and finally, in the fall of 1941 the deceased stated to Selig that when he settled up with Mrs. Moore, she

would be able to buy two houses similar to Selig's house which was valued at about $7,500. As late as September, 1942, the decedent admitted to plaintiff's brother that he had not paid plaintiff what he owed her. In September, 1942, the decedent, having cancer of the rectum, entered a hospital to have a colostomy performed. When he returned to plaintiff's rooming house in November, 1942, he was very weak and sick and required her services day and night for four months. The decedent required constant care inasmuch as the excretory processes took place through his side with no muscular control. From this time on the decedent took all his meals at plaintiff's house and she cleaned his room and prepared special foods for him. He paid one-half of the food bills for the two of them, accurate books being kept. In discussing this financial arrangement with plaintiff's brother the decedent stated that it would not compensate plaintiff but was all he could do at that time. After the operation the decedent went again to the hospital for blood transfusions and remained there several days. Finally, in December, 1943, the decedent became mortally ill; the plaintiff waited on him night and day. On January 4, 1944, he went again to the hospital where plaintiff continued to attend him, nurses being unobtainable. He died on February 7, 1944.

Mrs. Maude Oser, a tenant of plaintiff's testified as follows: "Well, I have seen her strip him and bathe him, clean him— get down on her hands and knees and scrub the floor where he had soiled it in his eruptions. Q. Eruptions from out of the side? A. Yes. Q. Was that on more than one occasion? A. Yes, it was several occasions that I saw that, and I have been there just after it had gone on many times. Q. You have been there at meal times? A. Oh yes, constantly. Q. Had you seen him eating? A. Yes. Q. Did he eat the same things the rest of the folks did when he returned from the hospital? A. Oh no, he was on a strict diet. Q. He had a special diet? A. Yes. Q. Who prepared the diet? A. Mrs. Moore." Another tenant, a Mrs. Crittenden, and a visitor, Frank Wise, corroborated the testimony of Mrs. Oser. Just prior to his death decedent gave Mrs. Moore his automobile worth $1,000, and in his will he left her a mortgage valued at $750. There is evidence that decedent did not need a special diet and that he spent many weekends alone, driving his car in the country. Taking the evidence favorable to the plaintiff there is evidence that decedent agreed to compensate plaintiff at a specified monthly

rate for the use of his room until he should cease to occupy it, evidence to support the findings that Babich was ill and confined to his room during the periods specified, and that at his special instance and request Mrs. Moore prepared and served his meals and nursed him during the day, and for certain periods during the night. There is also evidence that Babich expected to pay and that Mrs. Moore anticipated receiving compensation for rent of the premises and for services rendered, and evidence from which a reasonable deduction may be drawn that payment of the reasonable value of such services had not been made when the services terminated. The complaint was filed within two years after the termination of the services, at which time the causes of action sued upon are deemed to have arisen. (*Long* v. *Rumsey,* 12 Cal.2d 334 [84 P.2d 146] ; *Tabata* v. *Murane,* 24 Cal.2d 221 [148 P.2d 605] ; *Winder* v. *Winder,* 18 Cal.2d 123 [114 P.2d 347, 144 A. L. R. 935] ; *Lloyd* v. *Kleefisch,* 48 Cal.App.2d 408 [120 P.2d 97] ; *Beard* v. *Melvin,* 60 Cal.App.2d 421 [140 P.2d 720].)

In attacking the sufficiency of the evidence appellants stress the following code section provisions : That evidence of the oral admissions of a party should be viewed with caution (Code Civ. Proc., § 2061, subd. 4) ; that willfully suppressed evidence, if produced, would be adverse (Code Civ. Proc., § 1963, subd. 5) ; ''That higher evidence would be adverse from inferior being produced'' (Code Civ. Proc., § 1963, subd. 6) and ''That if weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust'' (Code Civ. Proc., § 2061, subd. 7). The above statutory provisions are ordinarily used as a guide to the trier of the facts, and are not considered by appellate courts except when there is no substantial evidence to support a judgment. Specifically, it is appellants' theory that the books of account were suppressed, that therefore the previous sections noted are applicable, and that it must be presumed that had they been produced, their contents would have been adverse to plaintiff. In this connection it appears that plaintiff kept an account of the amounts of money paid out for food for herself and decedent during part of the period of his illness and that decedent paid one-half of this amount, which arrangement had been agreed upon between plaintiff and decedent. The record does not disclose that any other book accounts were kept although plaintiff's brother referred

to seeing some "books." The pleadings do not indicate that this action is based upon a book account. ▉ Moreover, books of account, like admissions, are classified as secondary evidence. ▉ Plaintiff was disqualified as a witness to testify to conversations with the decedent or to explain any books of account not in the decedent's handwriting or kept under his direction but entirely in her handwriting, unless defendants interrogated her upon those subjects. (*Roche* v. *Ware*, 71 Cal. 375 [12 P. 284, 60 Am.Rep. 539] ; *Lucy* v. *Lucy*, 22 Cal. App.2d 629 [71 P.2d 949] ; *Deacon* v. *Bryans*, 88 Cal.App. 322 [263 P. 371].) ▉ Plaintiff could have identified books of account (11A Cal.Jur., p. 905, § 642), but it is questionable whether any such books were ever in existence, and, if so, whether they could have been classified as "stronger and more satisfactory" evidence than the acknowledgment of the indebtedness to third parties.

▉ Appellants' contention that the evidence is insufficient is based upon its claimed unreliability above discussed, and the alleged facts that no agreement existed between plaintiff and decedent and that the use of the room and the services rendered were given gratuitously by plaintiff. Appellants cite in support of their position *Herbert* v. *Lankershim*, 9 Cal.2d 409 [71 P.2d 220] ; *Broaddus* v. *James*, 13 Cal.App. 464 [110 P. 158]. *Herbert* v. *Lankershim*, *supra*, is a case in which there was no substantial evidence to support the trial court's findings and is clearly distinguishable not only on its facts but also in the issues involved. *Broaddus* v. *James*, *supra*, involves services rendered between relatives and the inferences concerning the gratuitous character of the services to be drawn therefrom. The determination of the question of the gratuitous nature of services is a factual one. Here it has been determined upon substantial evidence by the trial court contrary to appellants' theory.

▉ The rules governing this type of case are aptly stated in *Mayborne* v. *Citizens Tr. & Sav. Bank*, 46 Cal.App.178 [188 P. 1034]. The factual background of that case is not identical but similar and the appellant's legal contentions on the question of gratuity were there presented. In the Mayborne case, which is decisive in this case, the court said (pp. 181, 182, 183) : "Appellant does not dispute the general rule, as stated in *Moulin* v. *Columbet*, 22 Cal. 509, that 'when services are rendered by one person, from which another derives

a benefit, although there is no express contract or agreement to pay for the services, there is a ''presumption of law'' which arises from the proof of services rendered, that the person enjoying the benefit of the same is bound to pay what they are reasonably worth.'

''It is, though, justly contended that this is a mere presumption and 'liable to be rebutted by proof of a special agreement to pay therefor a particular amount or in a particular manner, or by proof that the services were intended to be gratuitous, or even by particular circumstances, from which the law would raise the counter-presumption that the services were not intended to be a charge against the party who was benefited thereby.' Appellant goes further in the claim that this case is an exception to the general rule in that plaintiff performed the services as a member of the household and, therefore, could not claim the advantage of said presumption or implication of law. Decisions are cited to the effect that under such circumstances the presumption is, rather, that the services are gratuitous and that the burden is upon the claimant to overcome this presumption. We need not review these various decisions as we find a sufficient guide for our purpose in the declarations of the supreme court in *Crane* v. *Derrick,* 157 Cal. 667 [109 P. 31], as follows: 'It has been said many times that the question is one that must be determined on the circumstances of the particular case, the question in each case being whether it can reasonably be inferred that pecuniary compensation was in the view of the parties at the time the services were rendered or the support was furnished. (Am. & Eng. Ency. of Law, 2d ed., p. 1061, sec. 21; *Murdock* v. *Murdock,* 7 Cal. 513; *Friermuth* v. *Friermuth,* 46 Cal. 42 45.) In the consideration of such circumstances, the degree of the relationship may strengthen or diminish the implication that the services are acts of gratuitous kindness and affection according to its proximity or remoteness. (1 Beach on Law of Contracts, sec. 653.) Our own decisions support the doctrine that to authorize compensation in such cases the circumstances must be such as to warrant the inference that it was the expectation of both parties that compensation should be made. (*Murdock* v. *Murdock,* 7 Cal. 513; *Friermuth* v. *Friermuth,* 46 Cal. 42.) And it is emphatically declared in *Murdock* v. *Murdock* that it is the expectations of the parties existing while the relation continued that is to control, and no circumstance occurring afterward can convert that into

an implied contract, that was not so before.' Under this test the claimant is not required to prove any express contract, but it is sufficient if from the facts and circumstances it reasonably can be inferred that compensation was in the view and contemplation of the parties. . . . We are required, of course, to go no further than to say that such conclusion of the trial court is not unreasonable, although we may believe that a finding the other way would be amply supported. Moreover, under the peculiar circumstances herein, although in a limited sense the parties lived together as a family, the industry, fidelity, and self-denial of plaintiff in the services she performed would indicate quite an unusual and extraordinary person if she had no expectation of such reward and reason to believe that it would be realized. The more rational inference would seem to be the other way, if we take into view the ordinary tests and motives of human conduct. Mr. Dutton's wants were thoughtfully supplied; he was carefully nursed in illness, and, as he grew old and feeble, he received increasing care and attention. Since there is no claim of any meretricious or improper relations between the parties, why should anyone suppose that she would so deport herself without expectation of substantial compensation?

"... The cases wherein such services are presumed to be gratuitous rest upon some natural or conventional obligation of mutual care and consideration, and the present instance hardly belongs to that class. Plaintiff was under no legal or moral duty to render services to Dutton. In contemplation of law they were strangers to each other, and as between such, the law says that beneficial services rendered and accepted must be paid for." (See, also, *Lloyd* v. *Kleefisch, supra; Long* v. *Rumsey, supra; Zellner* v. *Wassman,* 184 Cal. 80 [193 P. 84]; *Lundberg* v. *Katz,* 44 Cal.App.2d 38 [111 P.2d 917].)

With specific reference to the elements necessary in proving a contract to pay in this type of case, the Supreme Court in *Winder* v. *Winder, supra,* p. 128, quotes with approval from *Wainwright Trust Co.* v. *Kinder,* 69 Ind.App. 88 [120 N.E. 419] the following: " 'The intention to pay and the expectation of compensation may be inferred from conduct where equity and justice require compensation, as well as from direct communications between the parties. . . . [The] expectation of compensation may co-exist with higher motives prompted by affection or the sense of duty and . . . the

existence of the latter does not necessarily exclude the idea of pecuniary compensation. . . . To warrant the finding of such contract, the elements of intention to pay on the one hand, and expectation of compensation on the other, must be found to exist; but such elements, like other ultimate facts, may be inferred from the relation and situation of the parties, the nature and character of the services rendered, and any other facts or circumstances which may reasonably be said to throw any light upon the question at issue.' '' Applying these principles to the facts proven here, it must be determined that the evidence supports the trial court's finding that the decedent was bound to pay the reasonable value of the services rendered.

The judgment is affirmed.

Peters, P. J., and Atteridge, J. pro tem., concurred.