[Civ. No. 13745.   First Dist., Div. One.   Sept. 20, 1948.]

RUBY S. KAY, Respondent, v. SPEROS KARAS, as
Executor, etc., Appellant.

Jack Flinn and Albert E. Deasy for Appellant.

Philander Brooks Beadle for Respondent.

WARD, J.—This is an appeal by Speros Karas, executor of the estate of Peter Ganas from a judgment in the total sum of $6,048.03 in favor of plaintiff based upon two causes of action.

The complaint set forth as a first cause of action that at the date of the death of Peter Ganas, November 16, 1945, plaintiff was the sole owner of two savings deposit accounts standing in the name of Peter Ganas; that on December 21, 1945, plaintiff, who had been appointed special administratrix of the estate of Peter Ganas, permitted defendant, who was subsequently appointed executor of the estate, to have possession of the two passbooks, and that thereafter defendant withdrew the balances and became indebted to plaintiff in the sum of $3,676.81; that defendant refused and neglected to pay any portion thereof to plaintiff. The second cause of action stated that the deceased was indebted to plaintiff for personal services rendered by her to the deceased at his request, consisting of "serving as a grocery clerk in the grocery store operated by said deceased . . . checking and keeping account of rationed goods, keeping stock in order and waiting on trade in said grocery store; purchasing, preparing and cooking food for medically prescribed diet for said decedent; nursing care; furnishing transportation to decedent to and from his residence; taking said decedent to and from his doctor's office and hospital for treatments and ex-rays . . . from the 1st day of January, 1943 to and including the date of said decedent's death." It was further alleged that the executor rejected a claim for the amount due for personal services.

The answer admitted "that on the 16th day of November, 1945, there were two Savings Deposit Accounts in the name of the decedent, Peter Ganas, one in the Bank of America, National Trust & Savings Association, . . . No. 4819, in the

sum of $2,154.89; and one in the Anglo California National Bank, . . . No. 9581, in the sum of $1,521.92.'' Defendant alleged that plaintiff on November 17, 1945, was appointed special administratrix of the estate involved herein, and that on December 20, 1945, defendant was duly appointed executor ''and received said pass books from Plaintiff in her capacity as Special Administratrix and not otherwise.'' Defendant denied that the deceased was indebted to plaintiff in any amount.

Evidence was introduced and the court made findings of fact including the following: ''(2) It is true that on said 16th day of November 1945, plaintiff was the sole owner of two savings deposit accounts standing in the name of Peter Ganas . . . (4) It is true that on or about January 9, 1946, and in his capacity as executor of the estate of said decedent, defendant withdrew the balances of said savings accounts and thereupon became, and ever since has been indebted to plaintiff in the sum of $3,694.95, which sum is the total on deposit in said accounts at the time of such withdrawals . . . [Interest on this amount from January 9, 1946, to the date of judgment was found to be $362.08.] (7) It is true that said Peter Ganas, deceased, was at the time of his death indebted to plaintiff in the sum of $1,991.00 for personal services rendered by plaintiff to said Peter Ganas, deceased, at the special instance and request of said decedent. That said personal services consisted of the following: serving as a grocery clerk in the grocery store operated by said deceased . . . checking and keeping account of rationed goods, keeping stock in order and waiting on trade in said grocery store. That said sum of $1,991.00 is the reasonable value of said services so rendered . . . almost continuously over a period from the 1st day of January 1943 to and including the date of said decedent's death.'' In fixing the amount for personal services the trial court allowed only for services performed by plaintiff in connection with the conduct of the grocery business.

Defendant challenges the sufficiency of the evidence to justify the finding that plaintiff was the sole owner of the two savings accounts and that Ganas, the decedent, at the time of his death was indebted to plaintiff in the sum of $1,991 for personal services rendered at the special request of Ganas.

Defendant contends that plaintiff's case failed to show any sum due her for personal services: ''(1) There was no express or implied promise on the part of decedent to pay any com-

pensation for services rendered by plaintiff. (2) If plaintiff performed any work for compensation she was fully paid therefor.''

■ Plaintiff's disqualification under section 1880(3), Code of Civil Procedure, was waived by the defendant in that he took her deposition under sections 2055 and 2021, Code of Civil Procedure. (*Moul* v. *McVey*, 49 Cal.App.2d 101, 106 [121 P.2d 83]; *McClenahan* v. *Keyes*, 188 Cal. 574 [206 P. 454]; *Lohman* v. *Lohman*, 29 Cal.2d 144 [173 P.2d 657].) Defendant argues that there was no agreement, but that the testimony shows only a hope built upon a vague suggestion that she might be paid by decedent. ■ It is further argued that certain salary receipts signed by plaintiff negative any promise to pay in the future. There is evidence that plaintiff acknowledged the payment of certain amounts but that the acknowledgment was made at the decedent's request for use in connection with his income tax returns. This court is not prepared to say that the explanation of plaintiff is untrue. The trial court's conclusion must be accepted on appeal on this factual issue.

Plaintiff came to San Francisco in 1942, and was introduced during the same year by her father's brother to Peter Ganas. Plaintiff testified that she assisted Peter during the Christmas 1942 period. The evidence shows: ''A. Well, every so —— After the beginning of 1942, when I finished my work, I thought I was through, and then my Uncle Shoras said to me, 'Peter Ganas' niece you are, and you should help him more often,' and I says, 'Well, Uncle, I don't see how I can do it, because I work all day'; he says, 'You will work at night, after work, a few hours; that wouldn't be so very much for you'; so I agreed to do so; so in 1943, the early part, month of January, we sort of made arrangements which I should go to work. Q. Who made that arrangement? A. Peter Ganas. Q. Peter Ganas and you? A. And myself . . . At the beginning I thought I was only going to help him just for a few days, and then it eventually grew that I was working all the time. He told me I was going to work all the time. Q. Peter Ganas did? A. Peter Ganas. . . . Q. Was anything said by you or him as to whether you would be paid for your work? A. At first I thought I didn't want to come to work, thinking that I wouldn't get paid, and then he says—he told me, 'I want you to work and I am going to take care of you for working for me. Q. Did he ever say how much he was going to pay you for working for him? A. No.

Q. Did he repeat the fact that he was going to take care of you for working for him? A. Yes, in the latter part of the year, yes. Q. About when was that? A. When I had been there at least working with him six months, then he started to tell me that. He says, 'All this time you have never mentioned about pay or how much you are going to get,' and he said that, 'I have watched you faithfully to see if you are honest and you were'; that he was satisfied with my work and the way I never questioned him about being paid all the time, or what I expected to get; that—he then told me that he has sufficient of money provided for me to get paid, and when the proper time arrived. Q. Is that as close as he came to tell you when you would be paid? A. At that time. Q. About when was this conversation? A. About, oh, I would say '43, when I have been there with him at least six months. Q. Where did the conversation take place? A. In the store. Q. Was there anyone present? A. No, the two of us. Q. Did he ever again at any other time mention the subject of paying you? A. Yes, in early—in early '44—in early '44, he mentioned that, let's see—oh, in early '44, he told me then that he had it—he had money—he had more money than the books that he had given me; that he had a safe deposit box and in that safe deposit box I would get my wages for all the work I had done for him. . . . Well, he never exactly fixed the amount. He told me that I would get all what is proper amount that I should earn and whatever the amount is to be paid. Q. In your claim which you have filed against his estate, did you fix the amount? A. I fixed the amount, figuring what is right. Q. How much did you fix it? A. A dollar an hour. Q. The claim which you have filed is based upon wages of one dollar per hour? A. Per hour. . . . Q. How many hours a day did you work each week? A. Each week? Oh, you mean the hours a day? Q. Yes. A. About two and a half hours a day, and seventeen and a half hours for the week, I think.'' The evidence also shows that defendant delivered his safe deposit box keys to plaintiff and said she would find her pay in the box. On a number of occasions he asked for the keys but plaintiff always had them returned to her. The transcript shows that she did not have access to the box until after the death of Ganas. The following testimony appears: ''Q. You were working for him merely because of your love and affection for him? A. No, he told me at the beginning he was going to take care of me, sir. Q. You went to work depending on getting something out of it, isn't that right? A. I was going

to get paid for it, because he told me I was going to get paid. Q. There was no agreement to pay? THE COURT: Other than his promise and the fact that she did actually work. MR. FLINN [attorney for defendant] : Q. There was no definite agreement? THE COURT: Express agreement, you mean? MR. FLINN: Q. Express agreement as to the amount of the payment? A. At that beginning of the six months, no. Q. Or time of payment? MR. BEADLE [attorney for plaintiff] : Object to that: a misstatement of the evidence. She stated what he said as to time of payment and we can draw our own inference from that as to whether there was an agreement or not. THE COURT: Yes. MR. FLINN: Q. When did he give you the keys to the safe deposit box? A. In June, 1944, the time when he was so very sick. Q. You had those keys right up to this time, is that right? A. Yes, even today I have them. Q. Is your name on the safe deposit box? A. When? Q. Any time. A. When he was lying sick? Q. At any time has your name been on his safe deposit box? A. Well, it is now, sir. Q. Since when? A. Since he died.'' There was ample corroborative evidence to prove that plaintiff worked for Ganas, and two of the witnesses testified that Ganas had commented on the work she performed and that he would take care of her.

When there is evidence to show that compensation was contemplated, although no definite rate was agreed upon, the reasonable value of the services rendered may be recovered. (*Lundberg* v. *Katz,* 44 Cal.App.2d 38 [111 P.2d 917] ; *Manford* v. *Coats,* 6 Cal.App.2d 743 [45 P.2d 395] ; *Zellner* v. *Wassman,* 184 Cal. 80 [193 P. 84].)

A review of the evidence upon the issue whether a gift of the two savings deposit accounts was made, shows that plaintiff testified that in the presence of Mrs. Manley Harris he gave the books to plaintiff. The following testimony appears: ''A. When he had taken the books, he turned to me and says, 'Ruby, I want you to have these books for yourself. These are your books.' . . . Well, I looked at him surprised, then he says, 'Don't look at me surprised. These two books are yours. I want you to have them. I'm giving you these two books.' . . . I says, 'Uncle Peter, why are you giving me these two books and the money in those two books?' He says, 'Ruby,' he says, 'I have watched—I have studied you. You have been faithful, you have been honest, and you gave me great happiness that no other persons has given me.' He said, 'Your grandmother was the same in many ways.' He says, 'When

I was a youngster, I was an orphan and I was banged around left and right. When I was in trouble, when I needed something or food, I run to your grandmother and she would feed me. She would mend my clothes, she would wash my face, and she would take care of me and comfort me, and you are exactly like your grandmother and I have studied you being so much like your grandmother that I got very fond of you. For that reason I want you to have these two books for all the good kindness that you have offered me, and which I am sure you will take care of me and will still offer me more,' and that's the reason—that's the reason he gave me those books.'' Plaintiff further testified: ''I have a little box upstairs. It's a tin box and I hid them in there until I had decided to go back east to my sister's wedding. Then I handed them to Mrs. Harris so I wouldn't lose them.''

Mrs. Manley Harris testified: ''We had our dinner, and all of a sudden Uncle Peter lifted up—he wore many coats, heavy woolen, warm coats, and he lifted up his sweater, or opened one, and lifted up the sweater and reached in his pocket and took out a pocket book about the size of an envelope, like that (illustrating). Q. The size of an envelope, you think? A. About that size. You know, a man's wallet, that shape, that type of purse, and he took out of that some papers, looked like they were just papers, and then he took out bills, and then he took out the two books, and he said, 'Ruby, I am giving you these books and I' —— 'You have been good to me, nobody has ever been so good, I have tested you, I have watched you, and you are honest and good, you are like your grandmother, and you have lost a great deal, you lost your business, and I want to give you these books, these are yours, these will help you later.' I was quite surprised, and Ruby was—seemed to be stunned. . . . A. Well, she—Ruby spoke—she said, 'Why, Uncle Peter, why do you do that?' He said, 'Because I want you to have it, and I want you to have what I give you, I want it for you, to make up for all the goodness you have shown me, help you.' '' Mrs. Harris also testified that when plaintiff went East to visit a relative she kept the books for plaintiff; that Peter Ganas asked for the books several times to make deposits but made no withdrawals. After the death of Ganas the books were delivered to the plaintiff's attorney who subsequently turned them over to defendant executor.

The trial court decided that the withdrawal of the books from plaintiff and the making of nine additional de-

posits did not constitute ownership of the books or the money by decedent. This conclusion is supported by evidence that interest on deposits was entered, new deposits made, and that decedent never withdrew any of the money for his own use. Events occurring after the date of the gift may show whether the gift was completed or not. Decedent reported the income from the savings accounts in his income tax returns, but this may have been merely to relieve plaintiff of the tax problem..

A gift of a savings passbook may be held to be a gift of the money on deposit, subject to proper notice to the bank of the assignment, for the purpose of withdrawal by the donee. (*Ornbaun* v. *First Nat. Bank*, 215 Cal. 72 [8 P.2d 470, 81 A.L.R. 1146].) In the present case there were no withdrawals by Ganas and none by plaintiff. Notice to the bank of the assignment was not necessary unless plaintiff sought to withdraw part or the whole of the funds. If the trial court believed the statements of plaintiff and Mrs. Harris, the gift was complete. In *Wilson* v. *Crocker First Nat. Bank*, 12 Cal.App.2d 627, 630 [55 P.2d 1208], the court said: ''The rule that a gift of a savings pass-book is a gift of the money on deposit rests upon the well-settled doctrine that a gift of the symbol of a thing is a gift of the thing itself. This rule has been accepted and affirmed by all the authorities in this state.'' Each case may present a different problem—involving intent.

Unless there is evidence showing an abuse of the trial court's discretion appellate courts should not interfere. Here the conduct of the parties corroborates the gift of the passbooks (*Moore* v. *Spremo*, 72 Cal.App.2d 324 [164 P.2d 540]) and the performance of personal services at the request of decedent, which should be compensated for upon the basis of their reasonable value. (*Zellner* v. *Wassman, supra.*)

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.