[Civ. No. 4417. Fourth Dist. Jan. 3, 1952.]

A. W. LaFORGE, Appellant, v. ROBERT M. GROENDYKE et al., Respondents.

C. E. Crowley for Appellant.

John Lewis King, Frank Marino and Stanley Mussell, Jr., for Respondents.

BARNARD, P. J.—This is an appeal from a judgment awarding the defendant husband, who will usually be referred to as the defendant, an additional $6,000 for services performed.

The plaintiff lived with his wife and daughter Jessie in a house on a 34-acre walnut grove which he owned. He also had a son Gerald, who lived near by. In 1939, he had a hired man to whom he paid $30 per month, plus room and board. In September, 1939, the defendant asked for and was given the job, being paid $30 a month and receiving board and room. In November, 1939, the defendant married the daughter, and three children were later born to them. They lived with the plaintiff and his wife, all their living expenses and other items being paid from a joint checking account, later referred to. After the death of plaintiff's wife in June, 1946, the same arrangement continued. For some three years between 1940 and 1943, the defendant was also in partnership with his brother-in-law Gerald in raising hothouse cucumbers, devoting half his time to that project. They built hothouses costing $2,500, which was furnished by the plaintiff. When the project ended the defendant and Gerald sold everything and kept the proceeds.

From November, 1939, to 1945 a joint checking account was carried in the names of the plaintiff, his wife, and his daughter, Jessie. Mrs. Groendyke checked on this account and bought things as she desired for her own family and for the home in which they were living. In 1945, the defendant was given the right to draw checks on this joint account and he continued to draw such checks as he pleased until the account was exhausted sometime in 1948. The income from the ranch was deposited in this joint account and during the period in question $51,709.47 was deposited therein. During 1946 and 1947, the walnut grove seems to have been operated as a partnership. In the income tax returns for those years the defendant was reported as a partner in the operation of the grove and substantial profits were shown after allowing wages to both plaintiff and defendant, and the payment of considerable sums for outside help. In January, 1948, the defendant took full time employment in a neighboring town, which he continued until the trial of this action. In November, 1949, the plaintiff asked the defendant to vacate the house. The defendant refused to do so, saying he would make all the trouble that he could.

In January, 1950, the plaintiff brought this action in ejectment seeking restitution of possession of that part of the premises on which the house and its facilities were located. In their answer the defendants alleged "by way of counterclaim" that in 1939, the plaintiff orally promised them that if they were married and "would move upon the premises," and if the defendant would work thereon, they and the plaintiff and his wife would all live together "and the said defendants would eventually receive the said premises as their home"; that relying on these promises the defendants were married and moved upon the premises; that the defendant thereafter devoted his time to the ranch work; that he has performed the services to date and is willing to continue to perform them; and that the reasonable value of said services "to date" is the sum of $15,000. There was no allegation that such services had not been paid for or that any amount was due and unpaid. (See *Lloyd* v. *Kleefisch,* 48 Cal.App.2d 408 [120 P.2d 97].)

The defendants vacated the house on March 15, 1950, and the case was tried on May 2 and 3, 1950. Findings were filed on September 25, 1950, it being found that the parties had orally agreed in November, 1939, that the defendant would provide all labor and operate the walnut grove during the remainder of the plaintiff's lifetime; that the plaintiff would make the residence on the property available at all times to the defendants as their own home, "and to give the said residence structure to the defendants herein"; that in reliance thereon the defendant from 1939 to 1948 devoted substantially all of his time to the operation of the grove and at all times did "all things necessary" for its proper care; that during 1948, the defendant obtained employment elsewhere and "contributed proceeds from his earnings to the support of the plaintiff and to the operation of said walnut ranch on a part-time basis"; that the plaintiff repudiated the agreement in November, 1949, and refused "during the year 1949" to make the dwelling available to the defendants and refused to transfer it to them in consideration for the labor performed by the defendant; and that the services rendered by the defendant from 1939 to the repudiation of the agreement "were reasonably worth the sum of $6000 to the plaintiff, in addition to the value of the board, lodging and other compensation provided by the plaintiff to the defendants and family."

A judgment was entered on September 25, 1950, awarding the plaintiff possession of the house, and awarding the defendant $6,000 with interest from November 22, 1949. A motion for a new trial was argued and submitted on November 24, 1950. On December 4, 1950, the defendant filed an affidavit and notice of motion for permission to amend his "counterclaim" by striking out the allegation that the reasonable value of the services was $15,000, and by substituting an allegation "that the reasonable value of the aforesaid services to date in excess of and in addition to all benefits, credits or monies paid for said services heretofore, is the sum of $6000.00; that all of said sum of $6000.00 is now due and owing; that no part thereof has been paid." The affidavit stated that the counterclaim failed to allege that the amount was due and owing, and no part had been paid; that affiant intended to amend the counterclaim but neglected to do so; and that in order to conform to the proof and support the findings and judgment it was necessary that the amendment be made. The motion for permission to amend was heard and submitted on December 12, 1950. On December 15, that motion was granted, and the motion for a new trial was denied. The amendment thus permitted was filed on December 29, 1950. On January 3, 1951, the plaintiff filed notice of appeal from that part of the judgment which awarded $6,000 to the defendant.

The defendant concedes that the allowance of interest from November 22, 1949, was erroneous and that the judgment should be modified by striking out any provision for interest prior to the date of the judgment.

It is first contended that defendant's original "counterclaim" was defective in that it failed to allege nonpayment, and that the court erred in allowing it to be amended several months after judgment was entered. This procedure is questionable, especially under the circumstances which here appear. ■ Ordinarily amendments after judgment are allowed only on an application for relief, and after the judgment has been vacated. (*Keller* v. *Keller*, 132 Cal.App. 343 [22 P.2d 798]; *Security-First Nat. Bank* v. *Rospaw*, 107 Cal. App.2d 220 [237 P.2d 76].)

The main contention here is that the evidence is insufficient to support the findings and judgment to the effect that the defendant was entitled to $6,000 in addition to what he had already received. ■ The law implies a promise to pay for

services performed under circumstances disclosing that they were not gratuitously rendered. (*Long* v. *Rumsey*, 12 Cal.2d 334 [84 P.2d 146].) This is not the usual case of that nature, it being admitted that the services were not gratuitously rendered. The claimed indefinite promise to eventually give the house to the defendants may have been a sufficient basis for an implied promise to pay a reasonable value for the services, but it could go no further. The evidence that such a promise was made is far from satisfactory. It appears very improbable from the evidence as a whole, especially in view of certain physical facts making it next to impossible to separate the land around the house from the rest of the ranch, so long as the grove was to be operated. While the evidence is conflicting in this regard it is difficult, from the record, to understand why the court found that such a promise was made. Aside from that matter, and conceding the sufficiency of the evidence to show an implied obligation to pay the reasonable value of the services rendered, it was admitted, both by the pleadings and the testimony, that an extremely large part of that value had been paid and received. The real issues to be decided were as to what these services were reasonably worth, what part had been paid and what balance, if any, was due.

The defendant contends that he proved the obligation when he established the reasonable value of his services; that the burden was then on the plaintiff to prove what payments had been made; and that any failure of proof in this regard is chargeable to the plaintiff. ■ It is ordinarily true that where a plaintiff has proved the existence of a debt the burden of proving payment is on the defendant. (*Melone* v. *Ruffino*, 129 Cal. 514 [62 P. 93, 79 Am.St.Rep. 127] ; *Lloyd* v. *Kleefisch*, 48 Cal.App.2d 408 [120 P.2d 97].) It was necessary here for the defendant to first establish the existence of the debt relied on. The allegation and finding that these services were worth $6,000 more than what had been received call for something more than evidence of their reasonable value, without regard to the other element, in order to establish the debt. ■ Although the defendant argues that his testimony would support a finding that his services were worth $33,000, it was not found that they were worth that amount or any other amount. It was alleged and found that they were worth $6,000 plus something else, which is neither found nor established by the evidence.

The evidence as to the reasonable value of these services was also unsatisfactory. The defendant swore in his "counterclaim" that the reasonable value of his services over this period "is the sum of $15,000.00." He first testified that his services from 1935 to 1945 were worth $200 to $250 per month. He later testified that from 1942 to 1948 they were worth $300 to $350 a month. He testified that he worked evenings and Sundays on the grove in 1948 and 1949, that he did very little on the ranch in 1949, and that his services in 1948 and 1949 were worth $250 a month. He admitted that he received $30 a month besides a living for himself and family from 1939 to 1945; that during three years of that period he worked only half-time on the ranch; that during 1948, while employed elsewhere for six days a week, he worked on the ranch some evenings and Sundays; and that he worked there very little in 1949. It appears, without dispute, that the defendant's wife had access to the joint account from the date of the marriage until that account was exhausted in 1948, and that she wrote checks on that account as she pleased not only for living expenses, but for buying a refrigerator, an electric stove, a mangle and many other articles which she and her husband still claim and have. She estimated that she drew from this account $200 a month for the use of her own family during one year, but the testimony indicates that she used at least that much over most of the period in question. She made no estimate as to the amount she drew for medical or other expenses for her family. The defendant admitted that he was given access to this account in 1945; that this joint account was to be used for "whatever we wanted to use it for, however we wanted to use it"; that after 1945, he wrote checks on the account as he pleased; that whenever "we wanted" anything he went and bought it; and that he continued to do this until the account was exhausted in 1948. All of the income from the ranch was deposited in this joint account until 1948, and the only thing brought out in evidence was that the plaintiff had drawn checks on that account amounting to about $2,500. No attempt was made to show the amounts thus taken and used by the defendants, or to show what had become of the rest of the $51,000 deposited. The defendant admitted that he had handled the business in connection with this joint account after 1945 and that he made the deposits and received the bank statements and returned checks, which he still had. He testified that he had not kept an account as to the amounts thus taken for the use of himself

and his family, and that he did not know what it amounted to, although he testified that it was "possible" that his wife had drawn out $200 a month for the support of his family. No estimate was placed on the value of housing for his family, which he admittedly received for over 11 years.

Plaintiff's counsel sought to have these bank statements and checks produced for the purpose, among other things, of showing how much money the defendant had drawn out of the joint account for the use of himself and his family, but the court sustained the defendant's objections and refused to allow this evidence to be introduced. That fact is especially significant in view of the amendment which was later allowed, long after judgment was entered, without any further hearing, and without any opportunity to the plaintiff to attack the facts thus alleged by either pleading or evidence. There was never any finding as to the amount of the reasonable value of any services rendered. While it was admitted that some service had been performed and that large amounts had been received by the defendant in return for those services, there was no finding as to the amount or value of what had been received, there was no satisfactory evidence upon which such a finding could have been based, and the plaintiff was prevented from producing evidence which would have shown some of the missing facts, at least, which were essential before any just judgment could be entered.

The portion of the judgment appealed from is reversed.

Griffin, J., concurred.

Mr. Justice Mussell, being disqualified, takes no part in the decision of this case.

A petition for a rehearing was denied January 21, 1952, and respondents' petition for a hearing by the Supreme Court was denied February 28, 1952.