[No. H003831. Sixth Dist. Mar. 14, 1990.]

PHILIPPINE EXPORT AND FOREIGN LOAN GUARANTEE CORPORATION, Plaintiff and Appellant, v.
VICENTE B. CHUIDIAN et al., Defendants and Respondents.

[No. H004275. Sixth Dist., Mar. 14, 1990.]

PHILIPPINE EXPORT AND FOREIGN LOAN GUARANTEE CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
VICENTE B. CHUIDIAN et al., Real Parties in Interest.

1060

1062

1064

COUNSEL

James P. Kleinberg, Gregory P. Landis, Christine E. Sherry, Patrick A. Broderick, Elizabeth E. Bader, Thomas F. Cavalier and McCutchen, Doyle, Brown & Enersen for Plaintiff and Appellant and Petitioner.

Steven C. Finley, Lee S. Harris and Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris for Defendants and Respondents and Real Parties in Interest.

**OPINION**

**COTTLE, J.**—The issues in controversy in this case arise from an attempt by appellant and petitioner Philippine Export and Foreign Loan Guarantee Corporation (Philguarantee) to persuade the trial court to set aside a stipulated judgment in favor of respondents and real parties in interest Vicente B. Chuidian and several corporations (collectively Chuidian). We here decide together three matters: (1) the appeal of Philguarantee from the trial court's order refusing to set aside the stipulated judgment; (2) Philguarantee's motion for production of additional evidence on appeal or alternatively for a writ of error *coram vobis* to allow it to present evidence discovered while the matter was pending on appeal which allegedly was deliberately concealed by Chuidian and therefore could not have been obtained earlier; (3) Philguarantee's petition for a writ of mandate (or other extraordinary writ) seeking to stay execution or enforcement on the stipulated judgment. For reasons we shall state, we shall affirm the judgment on appeal and deny the motion to produce new evidence or for a writ of error *coram vobis,* and grant the writ of mandate in part.

### FACTS

Philguarantee was created in 1974 by the decree of former president of the Philippines Ferdinand Marcos as a government-owned entity intended to guarantee loans to be used to promote business in the Philippines. Chuidian obtained loan guaranties totalling $25 million from Philguarantee for his company, Asian Reliability Company, Inc. (ARCI), representing that the funds would be invested in Philippine industrial projects. In June 1985, Philguarantee sued Chuidian in the Santa Clara County Superior Court, contending that he had defaulted on the loans, requiring Philguarantee to pay them, and that the funds had been misused, in violation of the loan terms, for investment in Silicon Valley corporations and for Chuidian's private benefit.

Chuidian and Philguarantee entered into settlement agreements resulting in a stipulated judgment. Philguarantee relinquished all its claims for restitution against Chuidian, and abandoned its security interest in stock which Chuidian pledged on the ARCI loan. Philguarantee further agreed to pay

Chuidian $5.3 million, to be paid by means of an irrevocable letter of credit from a United States Bank. In return, Chuidian agreed to surrender stock in three corporations to Philguarantee—ARCI, Dynetics, Inc. (Dynetics), and Interlek Semiconductor, Inc. (Interlek)—companies that Philguarantee later claimed were debt ridden. (Interlek is allegedly now in bankruptcy; Dynetics is insolvent.) Chuidian also agreed to sign an affidavit denying that the Marcos family had any interest in his companies, and to surrender all copies of his deposition. Pursuant to these agreements, the parties signed a stipulated judgment December 17, 1985.

In February 1986 Marcos was deposed and the government of Corazon Aquino assumed power in the Philippines.

On April 16, 1986, Philguarantee moved to vacate the judgment, contending that it had been compelled by the Marcos government to make the settlement, that it was highly unfavorable to Philguarantee, and further that Chuidian had coerced Marcos into ordering the settlement by threatening to expose the investments of Marcos and his wife, Imelda, in Chuidian's enterprises. Philguarantee contended the agreements were illegal in purpose, coerced, and void, because the purpose of the settlement was to buy Chuidian's silence. On these grounds Philguarantee sought relief from the judgment under Code of Civil procedure section 473.

Philguarantee also argued that the present government of the Philippines has ordered it not to pay the judgment. It offered in evidence a memorandum dated March 13, 1986, memorializing a directive of the Philippine Commission on Audit, a government agency, ordering Philguarantee to make no further payments to Chuidian in whatever manner out of government funds, as contemplated under the agreements. The memorandum stated that President Aquino has ordered a restudy/reexamination of the agreements "with a view to determining their wisdom and propriety, if not legality, in the face of preliminary findings that the terms, provisions, and conditions stipulated therein, particularly the monetary aspects thereof, are manifestly and grossly disadvantageous to the Government."

On its motion to vacate the judgment, Philguarantee presented evidence susceptible of the inference that Marcos ordered Philguarantee to execute the settlement because he feared that otherwise Chuidian would expose the Marcoses' alleged financial interests in Chuidian's American companies. This evidence included, first, newspaper articles, particularly a series of articles published in the San Jose Mercury News in June 1985 stating that a serious financial problem for the Philippine government during the last years of the Marcos regime was the diversion of money out of the country

by wealthy Philippine residents, particularly powerful persons in the government or in business, who invested this money in businesses and real estate in the United States. Marcos was also accused of this practice, although because he and his wife did not make investments directly in their names it was difficult to trace their investments. Also there were articles in both the American and the Philippine press suggesting that the Marcoses were part owners of Chuidian's enterprise, ARCI, or were trying to gain control of it. These articles suggested that direct evidence that Marcos had invested in foreign property would seriously embarrass him at home.

Against this background, Philguarantee attempted to show that Chuidian exploited Marcos's vulnerability on the question of diversion of Philippine monies abroad, by threatening to inform American journalists of Marcos's investments, or offers to invest, in Chuidian's enterprises here, unless Marcos agreed to order the governmental corporation, Philguarantee, to settle its lawsuit with Chuidian on terms favorable to Chuidian. It offered evidence that Chuidian had told persons that he had evidence that Marcos had invested money in ARCI and that he intended to use this evidence to his advantage. For example, one Steve Psinakis, a Marcos opponent and a paralegal employed in a United States law firm, testified Chuidian told him that the Marcoses were 50 percent owners of ARCI. He also testified Chuidian told him he had proof that Marcos had been given funds from the company.

Further, Chuidian told Psinakis that he possessed tape recordings of some 40 hours of telephone conversations about the lawsuit with Philguarantee, touching on settlement negotiations, Marcos's links with ARCI, and related matters. According to Psinakis, Chuidian played some of these tapes for him and they were "valuable hard evidence" of Marcos's involvement in the lawsuit.

A former chairman of Philguarantee, Cesar Virata, testified Marcos expressed concerns about these tapes to Virata in a conversation in September 1985. Marcos was then facing impeachment and acknowledged concern about what Chuidian might reveal of these tapes.

A handwritten letter dated July 23, 1985, from Rosendo Bondoc (a former official of Philguarantee, who however allegedly acted on behalf of Marcos personally during settlement negotiations) to the Marcoses' personal lawyer, Ronaldo Zamora, reveals that Marcos told Bondoc to participate in secret negotiations in the lawsuit with Chuidian, with Zamora to be the vocal negotiator. Bondoc was then an employee of an agency run by Imelda Marcos, Home Financing Corporation (HFC). Bondoc and Zamora corres-

ponded regarding a proposed stipulated judgment during July and August 1985, and one settlement draft submitted by Bondoc to Zamora included (1) a proposed assurance from Marcos to Chuidian that no criminal charges would be filed against Chuidian in the Philippines and (2) a proposed promise by Chuidian that he would at "all times refrain from any further comment of any matter whatsoever or to entice commentaries relating to the ARCI controversy and any of the legal cases that have arisen therefrom. Chuidian will, separate to this agreement, execute a letter addressed to the president of the Philippines stating the true and exact nature of the stock-holdings in ARCI and Dynetics. This letter shall not be publicly disseminated except in case of breach by Chuidian of his warranty of silence in paragraph __ herein. This letter shall confirm the fact of the matter that Vicente B. Chuidian is the only substantial stockholder in ARCI Inc." The August draft of the settlement agreement used the phrase "warranty of silence." Letters passed between Chuidian and Marcos reiterating Chuidian's promises (1) to turn over copies of his deposition transcript in a related case where he had testified about Marcos's involvement and (2) not to disclose information of Marcos's involvement to anyone. Chuidian was to disavow Marcos's financial interests in his companies in order to clarify allegations which had been made in the press to the contrary. Philguarantee asserted that these various commitments amounted to a "warranty of silence" which was illegal and was basic to the settlement which followed.

Between the end of August and mid-September 1985, telexes containing further drafts of the settlement agreement were exchanged among Zamora, Marcos, Chuidian, and Chuidian's lawyers. Philguarantee alleges its officials and counsel did not participate in these negotiations. However, the declaration of Gregory Landis, one of Philguarantee's counsel, stated that Philguarantee consulted with its California lawyers, McCutchen, Doyle, Brown & Enersen (McCutchen) before signing, although disputing whether there was sufficient time for meaningful consultation. Landis made suggestions and changes.

Furthermore, there were also some private dealings. A telex dated September 17 marked strictly private and confidential and for Marcos's eyes alone was sent from Hector Donato, Bondoc's lawyer, to Marcos, showing that Marcos was eager to get a quick and private settlement agreement signed because of a growing political scandal involving his administration; Donato wrote that a secret signing would take place in Tokyo. According to Donato, Chuidian would receive a clearance from criminal prosecution and would do these things: (1) withdraw his sealed deposition in one of the pending cases in Santa Clara County Superior Court (one of the cases resolved by the settlement we now review); (2) deliver a letter disavowing

the Marcoses' involvement in his companies; (3) deliver certain journal entries and receipts and statements of account about which Donato expressed great concern. Psinakis testified that Chuidian discussed with him the existence of cancelled checks, journal entries and accounts detailing Marcos's link to Chuidian's companies, but Chuidian denies the existence of such material.

Further drafts of the proposed settlement communicated by telex in September 1985 similarly contained provisions that Chuidian would swear to the fact that the Marcos family owned no interests or stockholdings in ARCI or Dynetics. Psinakis testified that he discussed the subject with Chuidian and that the latter feared he might be guilty of perjury in signing such a statement.

The agreement was signed on October 5, 1985, under these circumstances: Philguarantee's board of directors had discussed Chuidian's proposed settlement agreement on September 30, 1985, and concluded that it was unfavorable, particularly as it did not provide restitution to Philguarantee for the $25 million in loans which Philguarantee had guaranteed for Chuidian. The board resolved on that date to recommend the filing of criminal charges against Chuidian and Bondoc. It further authorized Cesar Macuja (executive vice-president of Philguarantee and a director and chief executive officer of Dynetics) to travel to the United States to discuss the agreement, but he had no authority to sign a final agreement without board approval.

On October 3, 1985, Macuja departed for the United States along with Zamora. Thereafter, for two days, Zamora and Chuidian met privately without Macuja. At that point Philguarantee's American attorneys were still not aware of the settlement proposal and had not been consulted for advice. According to Chuidian, Zamora at first balked at the signing of the agreement, and wanted to see Chuidian's "evidence" before signing. Chuidian then played for Zamora portions of two tapes he had of conversations among Marcos, Bondoc, and Donato, as well as between Bondoc and Zamora, regarding the secret settlement negotiations and Chuidian's evidence. After hearing the tapes, Zamora agreed to sign. Psinakis testified that in his opinion playing the tapes was a "key factor" in the signing. Macuja signed the agreement on October 5, informing Chuidian, however, that the board of Philguarantee would still have to approve it.

The agreement did not provide restitution for Chuidian's loans. It required Philguarantee to give up all its claims against Chuidian; guaranteed payment to Chuidian under an irrevocable letter of credit the sum of $5.3

million; and gave Philguarantee in return Chuidian's stockholdings in three companies, namely, ARCI, Dynetics, and Interlek. Marcos received consideration as follows: Chuidian promised to sign a sworn affidavit denying the Marcos family link to ARCI, Dynetics or any of Chuidian's companies, and also denying that any member of the Marcos family had ever attempted, directly or indirectly, to take control of any of the named corporations. In addition it was agreed that the settlement would be kept confidential, that the United States companies would execute specified sworn statements, and that Chuidian would receive "an official opinion from the pertinent agencies of the Republic of the Philippines which shall substantially state that Vicente B. Chuidian is not criminally liable for any acts arising from ARCI/Dynetics transactions."

There is evidence in the record that at the time of the settlement, the value of the stocks transferred was up to $10 million. This evidence is the testimony of Mr. Macalincag, Philguarantee's officer in charge, a certified public accountant experienced in analyzing the financial condition of companies and projecting their income.

The Philguarantee board initially rejected the settlement agreement. However, under orders from Marcos it eventually approved a final settlement virtually identical to the October 5 agreement, which was finally signed on November 27, 1985. The final agreement was incorporated into a stipulated judgment filed with the court. A separate agreement was signed but not filed with the court or made public; in it the parties agreed not to comment on the case, and Chuidian agreed to execute the sworn statement discussed above regarding Marcos's noninvolvement with Chuidian's companies. Zamora in turn promised to sign a clearance of Chuidian from criminal prosecution.

Philguarantee maintains that the evidence incontrovertibly shows that Chuidian not only agreed to keep silent about Marcos's involvement with his companies, but agreed to lie, by promising to sign a sworn affidavit saying there was no connection between Marcos and the companies when Chuidian had previously testified under oath, in other litigation, that Marcos and his children were trying to take over Dynetics and ARCI and that Marcos was attempting to wrest control of these companies or pressure Chuidian into paying him some of their profits. Knowing that he would be guilty of perjury if he signed such a statement, Chuidian directed a subordinate, Josue Camba, chief financial officer of Interlek, to sign the statement instead.

Chuidian made no secret of the fact that in his opinion Marcos had been trying to take over Chuidian's companies or extort profits from them since

shortly after ARCI's incorporation in 1980, and he testified that he came to this country in late 1984 to escape efforts of the Marcos family to expropriate property from him and his family. In a lawsuit related to this one and involved in the final settlement (namely, Interlek's lawsuit against Dynetics, Philguarantee officials and others for misappropriation of trade secrets, interference with economic advantage and contractual relations, and related causes), Chuidian testified in a deposition sealed by agreement ("For Attorneys' Eyes Only") to his fear that Marcos or his family were in the process of taking over Dynetics and ARCI.

Chuidian also admits that the Marcos family was concerned in the summer of 1985 about allegations in the press that they owned financial interests in Dynetics, ARCI or other affiliates, and that the settlement drafts from the beginning contained requirements that Chuidian swear that they did not. The statement that Chuidian actually signed was precisely to this effect. However, the settlement agreement signed on October 5, 1985, in addition to that statement also contained the statement that the Marcos family had never attempted, directly or indirectly, to take control over even a limited financial interest in these corporations. Chuidian was not willing to commit perjury, as this statement would have been. He could state truthfully only that Marcos and his family had no direct shareholdings in the companies. Therefore, as discussed above, he had Camba make the second part of the required sworn statement "[b]ased on his knowledge of the circumstances." Camba testified that at the time the statement was true to the best of his knowledge.

Psinakis was an anti-Marcos activist who was in regular contact with Chuidian and who assisted him in preparing a political asylum application to enable him to stay in the United States. Psinakis testified that Chuidian told him he felt that Marcos had illegally been attempting to take possession of his properties and assets and that Chuidian intended to resist that through the United States courts. Psinakis also testified that Chuidian told him the Marcoses were 50 percent owners of ARCI but that Chuidian had no documents evidencing that ownership, that they were not stockholders of record and Psinakis had never seen any evidence of their stockholdings. Chuidian's testimony, however, was slightly different. He said he had no evidence that any of the Marcos family held stock in his corporations. He himself owned 98 percent of ARCI when this litigation commenced. He did say he had made an agreement with Mrs. Betty Benitez, an officer of ARCI and a friend of Imelda Marcos, allowing her to purchase up to 50 percent of the ARCI stock upon contribution of $9,250,000 to ARCI's capital. He did not know whether she would offer any part of this option to the Marcos family. Chuidian now argues that Psinakis must have assumed in his testi-

mony that monies given to Mrs. Benitez as a director and officer of ARCI were passed on to Marcos, and he therefore testified that Chuidian had told him Marcos was a partner in the enterprise. Chuidian testified that he did not know whether Mrs. Benitez offered any of this money to the Marcoses before her death, which occurred in an automobile accident.

As stated above, Marcos fled the Philippines some three months after execution of the settlement agreement, and after the Aquino government came to power, Philguarantee moved to set aside the settlement on April 16, 1986. That motion produced a full evidentiary hearing followed by the instant appeal. The trial court denied the motion, stating that Philguarantee had not sustained its burden of proof on the motion to vacate.

Chuidian previously petitioned this court for a writ of mandate, arguing that the act of state doctrine precludes judicial inquiry into the alleged fraud and coercion which Philguarantee claimed vitiates the settlement. We denied the petition. Chuidian does not raise the issue on the appeal; clearly the doctrine would not apply to Chuidian, a United States resident and businessman, any more than it would apply to shield Marcos himself in litigation between him and the Philippine government involving his alleged diversion of monies into the United States. (See *Republic of the Philippines* v. *Marcos* (2d Cir. 1986) 806 F.2d 344, 357-359; *Republic of the Philippines* v. *Marcos* (9th Cir. 1988) 862 F.2d 1355, 1361.)

The facts comprising Chuidian's attempts to execute on the stipulated judgment will be discussed separately in connection with the part of this opinion concerning the writ petition seeking to stay execution.

## DISCUSSION

### I. *Refusal to Vacate Settlement on Grounds That It Was Unjust, Illegal, Coerced, or a Product of Fraud*

Philguarantee's principal argument on appeal is that the trial court was compelled as a matter of law to set aside the settlement and resultant judgment for these reasons: (1) the agreement was unjust; (2) the agreement was illegal because Chuidian agreed to lie and to suppress evidence; (3) the settlement was coerced by Marcos and was a fraud. Philguarantee says that the agreement was not a settlement of disputed claims, but was an unjust agreement coercively imposed on Philguarantee. Its effect was to defeat the ends of justice, depriving Philguarantee of claims exceeding $25 million.

■ At the outset we must emphasize, however, that no rule of law gives an appellate court carte blanche to set aside an "unjust" settlement. The

case on which Philguarantee heavily relies—*Elston* v. *City of Turlock* (1985) 38 Cal.3d 227 [211 Cal.Rptr. 416, 695 P.2d 713]—does not so hold. That case was a case of excusable neglect in failing to respond to requests for admissions, resulting in matters being deemed admitted, destroying plaintiff's case. The court there held that the interest of substantial justice and the policy in favor of trial on the merits required that the default be excused.

Here we deal with an agreement of the parties—a settlement resulting in a stipulated judgment, where both parties were represented by counsel. Philguarantee is wrong when it argues that the same standards govern a motion to vacate such a judgment as obtain in a case of excusable neglect such as *Elston, supra.* Philguarantee does not ask us to relieve it from carelessness or inadvertence so that its claims can be resolved in a trial on the merits. Rather, it asks us to set aside its own agreement to a settlement of litigation, an agreement made while it was represented by counsel and after protracted negotiation. To analyze this problem we must turn, first, to the law of contract, which favors enforcement of valid bargains between private parties, and second, to the law of settlements, which favors private resolution of disputes. In a case such as *Elston, supra*, relief from inadvertent neglect is favored because of the preference for resolving disputes on the merits rather than because of mistake or excusable neglect; but here, all relevant policies cut in the opposite direction, favoring enforcement of the private bargain, dispute resolution by agreement of the parties, and finality of judgments. No case has ever held that the policy favoring a trial on the merits, operative in a case such as *Elston* where a party's legal rights are determined without a trial, governs a case as here where the parties have by agreement determined their own legal rights and rendered a trial unnecessary.

Nor do we have here the same concerns and tensions an appellate court faces when reviewing a trial court's decision not to vacate a default. That conflict, discussed in *Elston,* arises because the presumption that the trial court has ruled correctly conflicts with the policy favoring trial on the merits. Here there is no such conflict: relevant legal policies favor enforcing the parties' bargain, settling the lawsuit, and affirming the judgment of the trial court. Therefore Philguarantee bears the heavy burden of demonstrating that no substantial evidence supports the judgment of the trial court refusing to vacate the settlement.

■ The governing standard of review of a trial court order refusing to vacate a judgment is that "if any applicable ground will sustain the trial court's order, the ruling will not be disturbed on appeal . . . ." (*In re*

*Marriage of Jacobs* (1982) 128 Cal.App.3d 273, 284 [180 Cal.Rptr. 234].) And, a motion in the trial court to set aside a judgment is addressed to its sound discretion and will not be reversed without a clear showing of abuse of that discretion. (*McCreadie* v. *Argues* (1967) 248 Cal.App.2d 39, 44-45 [56 Cal.Rptr. 188]; *In re Marriage of Wipson* (1980) 113 Cal.App.3d 136, 141 [169 Cal.Rptr. 664]. See also *Moffitt* v. *Jordan* (1900) 127 Cal. 628 [60 P. 175]; *L.A. City Sch. Dist.* v. *Landier Inv. Co.* (1960) 177 Cal.App.2d 744, 750 [2 Cal.Rptr. 662]; 1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 223, p. 252 [similarly broad discretion of trial court in considering a motion to set aside a stipulation].) Finally, any factual conflicts in the evidence, whether presented by live testimony or by affidavit, must be resolved in favor of the prevailing party below. (*Estate of McCarthy* (1937) 23 Cal.App.2d 398, 401 [73 P.2d 914].)

We consider now Philguarantee's claim of coercion, which is that Chuidian's threats to expose Marcos's financial connections with Chuidian's American companies invalidate the parties' settlement as a matter of law. The issue is whether this settlement is illegal because Marcos may have ordered it in order to suppress politically embarrassing information.

■■■ A bargain may be avoided on grounds of physical coercion, undue influence, or on the basis of an improper threat, such as a threat constituting blackmail. The Restatement of Contracts defines such threats very broadly under the heading of economic compulsion. Impermissible threats include bad faith threatened use of civil process; threats which are a breach of the duty of good faith and fair dealing under a contract with the recipient; threats which would harm the recipient without significantly benefitting the party making the threat; or threats where "what is threatened is otherwise a use of power for illegitimate ends." (Rest.2d Contracts, § 176, pp. 481-482.)

The doctrine of economic duress has been described recently as follows: "As it has evolved to the present day, the economic duress doctrine is not limited by early statutory and judicial expressions requiring an unlawful act in the nature of a tort or a crime. [Citations.] Instead, the doctrine now may come into play upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure. [Citations.] The assertion of a claim known to be false or a bad faith threat to breach a contract or to withhold a payment may constitute a wrongful act for purposes of the economic duress doctrine. [Citations.]" (*Rich & Whillock, Inc.* v. *Ashton Development, Inc.* (1984) 157 Cal.App.3d 1154, 1158-1159 [204 Cal.Rptr.

86]; see also *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1073, fn. 6 [202 Cal.Rptr. 116].)

We deal with a civil lawsuit to set aside a stipulation and not with a criminal prosecution; however there is little precedent developing the concept of civil economic duress, and therefore we have found it helpful in our resolution of this dispute to examine the criminal law of blackmail and extortion to gain a fuller understanding of the concept of an impermissibly coercive act.

In California it constitutes criminal extortion to obtain property from another by a wrongful use of threats to expose any "deformity, disgrace or crime" or "any secret affecting [the victim or his family]." (Pen. Code, §§ 518, 519.) ■ The "secret" referred to in the statute is a matter "unknown to the general public, or to some particular part thereof which might be interested in obtaining knowledge of the secret; the secret must concern some matter of fact, relating to things past, present or future; the secret must affect the threatened person in some way so far unfavorable to the reputation or to some other interest of the threatened person, that threatened exposure thereof would be likely to induce him through fear to pay out money or property for the purpose of avoiding the exposure." (*People* v. *Lavine* (1931) 115 Cal.App. 289, 295 [1 P.2d 496].) Whether a threatened exposure would have this effect on the victim is a factual question and depends on the nature of the threat and the susceptibility of the victim. (*People* v. *Fox* (1958) 157 Cal.App.2d 426, 430 [321 P.2d 103]; *People* v. *Peniston* (1966) 242 Cal.App.2d 719, 722-723 [51 Cal.Rptr. 744].)

■ Another impermissible threat is a threat of criminal prosecution, which in contract as in criminal law constitutes a plainly wrongful act and will avoid a bargain. (See, e.g., *Morrill* v. *Nightingale* (1892) 93 Cal. 452, 455 [28 P. 1068]; *Bridge* v. *Ruggles* (1927) 202 Cal. 326, 331 [260 P. 553]; see generally 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 419 pp. 375-376; Rest.2d Contracts, *supra,* § 176, pp. 481-482.)

The question of duress, as that of criminal blackmail, is a factual question; the existence of duress always depends upon the circumstances. Thus one authority points out that duress is tested, not by the objective nature of the threats, but by " '*the state of mind induced thereby in the victim. The means used to produce that condition, the age, sex, state of health, and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his will power.'* . . . [Citation.]" (*Balling* v. *Finch* (1962) 203 Cal.App.2d 413, 419 [21 Cal.Rptr. 490], italics in original.) In *Balling* v.

*Finch* the court applied that factual standard to the form of duress it termed "illegal business compulsion" (*ibid.*), and found sufficient to survive a motion for summary judgment the defendant's allegations that the plaintiff had obtained defendant's signature on a promissory note by threatening defendant, an attorney, with criminal prosecution and a damaging report to the Corporation Commissioner. Similarly here it is surely a factual question whether Marcos's susceptibility to pressure of this kind caused him to compel Philguarantee to enter into this settlement. Subsidiary questions, equally factual, include the extent to which Marcos's alleged investments had already been revealed in the press and elsewhere, the nature of the threats themselves, whether Chuidian said he would go to the press, or would pursue the lawsuit where these matters would be revealed, or other possibilities.

The "threats" which Chuidian posed to Marcos allegedly consisted of either threats to prosecute a civil lawsuit, or threats to reveal damaging information to the press. Those types of threats pose the most difficult problems in the law of blackmail and the contract law of duress, because they are threats to take actions which are legal under many circumstances. For instance, a person, generally speaking, has a perfect right to prosecute a lawsuit in good faith, or to provide information to newspapers. Language can be found in many decisions that it is not an illegal threat for a person to do " 'what he has a legal right to do.' " (See, e.g., 1 Witkin, Summary of Cal. Law, *supra,* Contracts, §§ 420-422, pp. 376-380; *Wurtz* v. *Fleischman* (1980) 97 Wis.2d 100 [293 N.W.2d 155, 160] [economic duress case]; *People* v. *Schmitz* (1908) 7 Cal.App. 330, 369 [94 P. 407] [extortion prosecution].)

Yet clearly that proposition cannot always be true, for in many blackmail cases the threat is to do something in itself perfectly legal, but that threat nevertheless becomes illegal when coupled with a demand for money. (See e.g. *Berger* v. *Berger* (Fla.Dist.Ct.App. 1985) 466 So.2d 1149 [husband's threat, for his own monetary advantage, to exercise legal right to turn wife and her partners in to the IRS for failure to report cash receipts is extortion]; *State* v. *Workman* (1984) 14 Ohio App.3d 285 [471 N.E.2d 853] [no defense to extortion that damaging statements threatened to be exposed were true, so long as their exposure could cause ridicule, contempt and damage to reputation of victim]; see generally Lindgren, *Unraveling the Paradox of Blackmail* (1984) 84 Colum.L.Rev. 670.) Also it is well known that the "right" to file a lawsuit has limits, namely the boundaries of the torts of malicious prosecution and abuse of process. It has been said that the decision whether a lawsuit is maliciously brought must result from "an appropriate accommodation between the freedom of an individual to seek redress in the courts and the interest of a potential defendant in being free

from unjustified litigation." (*Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1169 [232 Cal.Rptr. 567, 728 P.2d 1202].)

■ Similarly when we consider the legitimacy of conduct consisting of attempts to achieve a favorable settlement of litigation, we must also accommodate the values of the adversary system and the rights of persons to be free from pressure that is perceived as "wrongful." Frequently, threats of suit alone are considered within a party's rights, and not characterized as wrongful duress; thus, an annotation observes that in many cases it is not a defense to an action on a promissory note to claim economic duress or coercion because the plaintiff threatened suit. (See Annot. (1977) 79 A.L.R.3d 598, 617, § 8.) A commentator notes that an even more difficult problem is posed by the threat of publicity incident to the filing of a lawsuit. (Livermore, *Lawyer Extortion* (1978) 20 Ariz.L.Rev. 403, 407.) If damaging publicity is inevitable as a result of a lawsuit filed in good faith, surely the filing itself cannot be said to constitute impermissible duress or extortion; yet under some circumstances courts have found such duress to exist when the person threatens such publicity before suit or when the lawsuit is not perceived to be brought in good faith. (*Id.*, at pp. 407-408.)

Again, as is the case in finding blackmail or duress, the issue—whether the means used by the threatener are justifiable—is a factual issue, dependent upon such matters as "whether the settlement effected in litigation is in excess of the amount legitimately due and, thus, [whether] the defendant was profiting by trading in silence." (20 Ariz.L.Rev. at p. 407.)

The area is fraught with difficulty and each case must depend on a careful weighing of all the circumstances. We, as a reviewing court, are limited to deciding whether the complex record presented contains substantial evidence to support the trial court's conclusion that Chuidian did not go beyond the legitimate bounds of pressure upon an adversary in litigation. ■ We find there is such evidence. The record does not establish as *a matter of law whether or to what extent his threats influenced Marcos to* enter into the settlement. Publicity had already occurred regarding the investments of the Marcoses, and others; allegations that the Marcoses owned part of ARCI or were interested in the company had appeared in the California and Philippine press since 1984. It is possible that the trial court did not perceive Chuidian's threats of exposure as a substantial cause of Philguarantee's agreement to settle the case. Nor is there a showing here of such disproportionate bargaining power and coercive circumstances as between Chuidian and Marcos, then an absolute dictator, as to amount to duress as a matter of law. (Cf. *Rich & Whillock, Inc.* v. *Ashton Development,*

*Inc., supra*, 157 Cal.App.3d 1154.) The trial court, upon conflicting evidence, has decided those issues, and the record does not compel reversal as a matter of law. At best this record raises factual issues regarding the degree of pressure exerted upon Marcos and thereby upon Philguarantee, a governmental corporation. Similarly a matter of factual conflict is the question whether the settlement was of any material advantage to Philguarantee when entered upon, and again, although as Philguarantee says there may be a good deal of evidence that the companies it received were without value, there is also record evidence that the stock received may have appeared to be worth some $10 million. Such factual issues are for the trial court's resolution.

It is not clear whether Philguarantee is also arguing that illegal coercion consisted of pressure exerted by Marcos upon Philguarantee. If so, that argument must fail for two reasons. The first reason is that like duress, the question of coercion of Philguarantee is factual and has been determined below in a lengthy hearing upon a complex set of facts. ■ The second reason is that as a creature of the Philippine government more or less bound to do its bidding, Philguarantee has no standing to vitiate its agreements on the basis that it has been coerced by that government, even though a change of political power may have changed the realities of its situation. Precedent holds that one in Philguarantee's position cannot claim to be coerced by the very government of which it is a part, because such a claim is essentially a claim of self-coercion and if accepted leads to governmental repudiation of its just debts because of a change of political power. (See *Alfred Dunhill of London, Inc.* v. *Cuba* (1976) 425 U.S. 682, 695 [48 L.Ed.2d 301, 311-312, 96 S.Ct. 1854].)

■ We turn to Philguarantee's claim that the agreement is illegal because it purportedly requires Chuidian to lie or to suppress evidence, and also because it purportedly promises him immunity from criminal prosecution. First, we do not think that as a matter of law the agreement calls for Chuidian to perjure himself. It required him to state that Marcos was not a stockholder in his companies, a fact not shown to be untrue. As for the machinations resulting in his having a corporate officer say what Chuidian could not say, namely, that Marcos had never tried to take over these companies, we point out that we lack authority to set aside a private bargain because of the parties' willingness to engage in conduct some of us may find offensive. There is nothing actually illegal in the kind of hard bargaining and adherence to technicalities which has gone on here. The trial court after a full three-day hearing (which in turn followed more than a year of discovery) found vacating the judgment was not warranted. We defer to its judgment.

We turn to the "warranty of silence" allegedly promised by Chuidian, which Philguarantee contends is an illegal promise. That promise, it will be recalled, consisted of (1) Chuidian's promise to sign a statement that the Marcoses did not own any share in his companies, coupled with the willingness of a corporate officer to swear that in his opinion the Marcoses had never tried to acquire the companies; (2) Chuidian's agreement to hand over copies of his deposition in the Interlek v. Dynetics lawsuit (in which he expressed belief that someone in the Marcos family was trying to take over his companies); (3) the parties' agreement to keep the settlement here private. Philguarantee relies principally on the rule of law that it is illegal and against public policy for one who has a duty to reveal a material fact to a court to agree to conceal that fact. (*Williamson* v. *Superior Court* (1978) 21 Cal.3d 829, 836 [148 Cal.Rptr. 39, 582 P.2d 126]; *Allen* v. *Jordanos' Inc.* (1975) 52 Cal.App.3d 160, 166 [125 Cal.Rptr. 31]; *Brown* v. *Freese* (1938) 28 Cal.App.2d 608, 618 [83 P.2d 82]; see generally 14 Cal.Jur.3d, Contracts, § 139, p. 367.)

Those decisions, however, all involve agreements to suppress evidence in ongoing litigation or administrative proceedings. The *Williamson* case, *supra*, involved an agreement to suppress evidence in ongoing litigation, as is also true of other authorities there cited. (*Valentine* v. *Stewart* (1860) 15 Cal. 387, 404; *Petterson* v. *Superior Court* (1974) 39 Cal.App.3d 267 [114 Cal.Rptr. 20].) As pointed out in *Williamson,* attempts to suppress or alter testimony in a trial are criminal in California. (21 Cal.3d at p. 837, fn. 3.) The *Allen* case, *supra*, involved an agreement to withhold from the interested state agency information essential to its determination of the plaintiff's right to unemployment benefits.

None of these decisions apply to the promises made by Chuidian. The record is susceptible of the conclusion that the first statement, that the Marcoses had not invested in Chuidian's companies, was a correct statement on its face, and making it did not suppress anything. The agreement to keep the settlement private was not an agreement to suppress evidence and was not illegal. Our experience with litigation in the Silicon Valley is that such agreements are routine here. Chuidian's agreement to turn over his copies of his deposition in one of the settled matters is similarly not shown as a matter of law to be an act which has a tendency to suppress evidence. The records of the court such as the stipulated judgment and the deposition remain in the file and are presumptively available to the public on a proper showing of necessity. (See generally *Estate of Hearst* (1977) 67 Cal.App.3d 777 [136 Cal.Rptr. 821]; *Mary R.* v. *B. & R. Corp.* (1983) 149 Cal.App.3d 308 [196 Cal.Rptr. 871]; Annot. (1978) 84 A.L.R.3d 598.) Chuidian's agreement did not suppress or withhold evidence from the court or from any

party to the lawsuit. Accordingly we hold that the consideration for the settlement was not illegal as a matter of law.

■ We turn to Philguarantee's contention that the judgment is illegal because it included a promise not to prosecute Chuidian. The evidence of that promise consists of the statement signed by Zamora that Chuidian was not liable for any criminal offense under Philippine laws arising from the facts in this litigation. This statement is not necessarily a binding promise not to prosecute Chuidian by one with authority to make such a promise. The record does not establish to what extent the Philippine government, as it was constituted at the time of the stipulated judgment, would imply any such promise from this statement. On its face it amounts to an official opinion of no criminal liability, not necessarily a promise not to prosecute such as would, in California, be against public policy. (See *Bowyer* v. *Burgess* (1960) 54 Cal.2d 97 [4 Cal.Rptr. 521, 351 P.2d 793]; *Balling* v. *Finch, supra,* 203 Cal.App.2d 413, 420; *Hoines* v. *Barney's Club, Inc.* (1980) 28 Cal.3d 603 [170 Cal.Rptr. 42, 620 P.2d 628, 26 A.L.R.4th 229].)

Counsel for Philguarantee has argued to this court a surficially persuasive position, that we should not compel the Philippine people, who have rejected the Marcos government, to bear debts for which he may have been responsible. But that argument misconceives the limited role of a court of law and of an appellate tribunal. A court of law has no power to undo the debts and commitments of a deposed government simply because the government has changed, nor because many may perceive that change as beneficial. (See *Alfred Dunhill of London, Inc.,* v. *Cuba, supra,* 425 U.S. 682.) And an appellate tribunal has no power to retry the facts which have been determined by a trial judge after lengthy inquiry and deliberation. Issues such as blackmail, duress, and inequity are purely factual. It is not our role to decide such matters in the first instance nor to undo the deliberations of the superior court unless it can be shown that the trial court acted according to incorrect legal principles or that no substantial evidence supports its decision. Here neither of those conditions exists. On the contrary the record may suggest much wrongdoing by the Marcos government but it falls far short of compelling the conclusion that Chuidian's behavior in this lawsuit compelled Marcos to settle this case. And most of the inequitable conduct and wrongdoing which Philguarantee's counsel urges before us was in fact the doing of Marcos and not of Chuidian, so far as this record shows.

The record here presents conflicting evidence concerning (1) the motivations of Marcos and of Philguarantee for entering into the stipulated judgment; (2) the extent to which Marcos was put under pressure by threats of Chuidian to reveal evidence of Marcos's attempts to take over ARCI; (3)

the perceived value to Philguarantee at the time of the settlement of the consideration it received; (4) the extent of any actual monetary investment by the Marcoses in Chuidian's enterprises; (5) the question whether Chuidian was actually promised immunity from prosecution by one in a position to honor that promise, and as a subsidiary matter, whether Chuidian was in fact liable for any criminal offense in the Philippines when the alleged promise was given. The trial court considered these factual matters and concluded Philguarantee had not carried its burden of showing that the settlement of the parties should be set aside. We do not find as a matter of law that Philguarantee carried its burden in the trial court, and therefore we are bound to affirm the judgment below.

II. *Whether the Trial Court's Discovery Orders and Evidentiary Rulings Were an Abuse of Discretion Requiring Reversal of the Judgment*

Philguarantee argues that there are serious procedural infirmities in the hearing on its motion to set aside the judgment, requiring reversal on that ground. It contends: (1) The trial court should not have cut off attempts to depose three witnesses in the Philippines (Zamora, Bondoc, and Macuja); (2) the trial court erred in refusing to allow Philguarantee to question Chuidian about documents discovered in Manila in April 1987 (the Manila documents), which allegedly chronicle the secret negotiations leading up to the October 5 settlement and which were generated by Chuidian or his agents; (3) the trial court erred in excluding evidence of tape-recorded telephone conversations made or received by Chuidian during settlement negotiations, which allegedly prove Marcos's personal participation in the settlement discussions and his political motivations in settling with Chuidian. The tapes were excluded under Penal Code section 632 (evidence of a tape-recorded conversation made in violation of the eavesdropping laws is inadmissible in judicial proceedings); (4) inferences favoring Philguarantee should have been made because of the unavailability of the tapes, some allegedly disposed of by Hector Donato, Chuidian's Philippine attorney; (5) the trial court erroneously found privileged communications between Donato and Chuidian, despite evidence that Donato was working for Marcos.

In general, the management of discovery matters lies within the sound discretion of the trial court. (E.g., *Moskowitz* v. *Superior Court* (1982) 137 Cal.App.3d 313 [187 Cal.Rptr. 4].) Where there is a basis for the trial court's ruling and it is supported by the evidence, a reviewing court will not substitute its opinion for that of the trial court. (*Carlson* v. *Superior Court* (1961) 56 Cal.2d 431, 438 [15 Cal.Rptr. 132, 364 P.2d 308].) Calendar management and setting of cutoff dates for discovery is similarly the trial

court's province. (Cf. *Omaha Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1266, 1272 [258 Cal.Rptr. 66].) ▆▆▆ And finally, to obtain a reversal of a judgment on appeal on the ground of erroneous discovery rulings, appellant must demonstrate the rulings were so prejudicial as to constitute a miscarriage of justice. (*Wooldridge* v. *Mounts* (1962) 199 Cal.App.2d 620 [18 Cal.Rptr. 806]; see Cal. Const., art. VI, § 13.) In our view, these principles preclude reversal here.

## A. *Manila Depositions*

The court granted Philguarantee letters rogatory to take depositions in the Philippines in May 1986. These depositions and the pending motion to vacate the judgment were continued periodically for various reasons. Philguarantee contends much of the delay was due to various challenges filed by Chuidian (such as a petition for extraordinary relief to this court on grounds of act of state immunity), but does not demonstrate that such tactics were frivolous or amounted to abuse of process. In any event, the depositions were finally set for April 21, 1987, and counsel for both parties traveled to Manila, counsel for Chuidian having bought a nonrefundable round-trip ticket. Once there the witnesses (Zamora, Bondoc, and Macuja) refused to appear for their noticed depositions. Philippine counsel contended the depositions were untimely noticed by Philguarantee, that the deponents had but one day's notice, and one of them could not appear because he was running for political office. The Manila court ultimately rescheduled the depositions for mid-May 1987. But counsel for Chuidian refused to stay in Manila after May 1, for which date he had a return ticket, and returned to the United States and applied to the trial court for a protective order, saying the discovery cutoff date had passed and it was too burdensome to make yet another trip to the Philippines. The trial court concluded that from the evidence presented it was unlikely that the three witnesses would ever attend depositions. Accordingly it granted a protective order preventing further depositions in the Philippines.

▆▆▆ In harmony with the role of an appellate court in reviewing discovery matters, we defer to the trial court's conclusion that the likelihood of obtaining successful depositions was too small to warrant further burdensome attempts and attendant delay. The proposed subject of the depositions, Marcos's participation in settlement negotiations and fear of publicity, was fully explored and documented in voluminous evidence presented.

## B. *Manila Documents*

When Chuidian's deposition was first taken, counsel for Philguarantee reserved the right to reopen questioning further as to any new matters that

might surface in Manila. In Manila, counsel discovered new documents in the possession of an agency, the Philippine Presidential Commission on Good Government (PPCGG). These documents were allegedly authored or received by Chuidian or his agents. The trial court granted Chuidian's request to prevent questioning about these documents when his deposition resumed. The documents allegedly chronicle the secret negotiations leading up to the October 5 settlement.

Chuidian argues that since April 1986 when Philguarantee filed the motion to vacate, Philguarantee had worked closely with the PPCGG and had filed affidavits with the court from a commissioner of that agency. Further, Chuidian's deposition was taken over a five-day period in February 1987, and thereafter the parties had agreed to exchange all documents by a stated date. Chuidian argues that Philguarantee presents no compelling showing why it could not have obtained the documents in question, more than 120 such documents, at an earlier date, rather than in May 1987 after the cutoff date had passed. The trial court denied the motion to prolong discovery by permitting questioning upon these documents. That ruling was within its broad discretion to control discovery matters and to resolve conflicting facts. Nor, as in the case of the Manila depositions, does Philguarantee make a showing of reversible error in light of its ample opportunity to depose Chuidian as well as the considerable evidence it did present of the "secret negotiations."

## C. Tape-recorded Conversations

Philguarantee sought to introduce in evidence transcripts of tape-recorded phone conversations between Marcos and Chuidian to show Marcos's personal participation in the settlement discussions and his political motivations, including his desire to obtain Chuidian's "warranty of silence." Chuidian objected under Penal Code section 632 which renders inadmissible in evidence confidential communications illegally obtained by eavesdropping within the statute. Philguarantee argues that exclusion under this statute requires first, that the trial court place the burden on Chuidian to show inadmissibility since the evidence is relevant (citing Evid. Code, §§ 400 and 550) and second, that the trial court make a preliminary finding that the statute in fact was violated. (*Deeter* v. *Angus* (1986) 179 Cal.App.3d 241, 254 [224 Cal.Rptr. 801].) Philguarantee says Chuidian presented no evidence to show the circumstances under which the tapes were made or whether the parties to those calls had any reasonable expectation of privacy.

The authorities Philguarantee cites do not require the trial court to make specific, written fact findings as to the confidentiality of the material, but

require the trial court to find, as a preliminary matter, that the material is within the statute. Here, acting as fact finder on the issue, the trial court reviewed all arguments pertaining to the tape transcripts and concluded that the statute applied. That finding is supported by the record and therefore conclusive on this court. (See *Warden* v. *Kahn* (1979) 99 Cal.App.3d 805, 815 [160 Cal.Rptr. 471].) Further, as with the discovery material, the tape transcripts have not been shown to add vital matter to the record which probably would have produced a different ruling, since the record is already replete with evidence of Marcos's involvement and his motivations. We conclude the exclusion of the tapes was not error, but even if it were, the evidence was cumulative and we would not reverse on that ground.

### D. *Adverse Inferences*

Chuidian admitted making, receiving and keeping some 35 tapes of Marcos and others discussing the settlement. Articles from newspapers and deposition testimony of Psinakis also corroborated existence of such tapes. However, in response to discovery requests Chuidian produced only four taped conversations, and claimed attorney-client privilege as to a fifth. He said he gave the rest to his Philippine attorney, Hector Donato, to "dispose of at the appropriate time in the appropriate fashion." He further claimed Donato and the tapes had disappeared. Philguarantee then asked the trial court to draw the following inferences regarding the missing tapes disposed of by Donato: that they contained testimony adverse to Chuidian's interest; that they incriminated Marcos; and that Marcos sought to conceal their contents. The trial court declined to draw these inferences.

 Chuidian's testimony was that he gave the tapes to Donato in late January 1986, a date before Philguarantee moved to set aside the settlement. Such evidence does not compel the trial court, as a matter of law, to infer complicity between Chuidian and Donato regarding the destruction of the tapes; in fact it does not necessarily compel a conclusion they were deliberately destroyed. But if the tapes were damaging to Marcos, and it was he who sought to conceal them, then we do not see how it follows that inferences adverse to Chuidian should be drawn. If anything, the inferences should be adverse to Marcos. Lacking record evidence of willful suppression of evidence, the trial court was not in any case bound to draw adverse inferences. (See *Moore* v. *Spremo* (1945) 72 Cal.App.2d 324 [164 P.2d 540].) And again, these tapes at best would have been cumulative of evidence otherwise presented and their loss cannot be said to be the cause of Philguarantee's failure to obtain a favorable ruling.

## E. *Finding of Privilege*

Chuidian objected to production of one tape-recorded conversation between himself and Hector Donato on the grounds that Donato acted as his attorney in the settlement negotiations. Although the trial court permitted discovery of the tape on grounds of waiver, it upheld Chuidian's claim of attorney-client privilege as to Donato, and therefore precluded further questioning of Chuidian regarding conversations with Donato during the secret negotiations with Marcos.

Philguarantee contends the trial court should have been convinced by its evidence showing that Donato was in fact working for Marcos on the other side of the bargaining table. This testimony showed that Donato was under the control of Marcos and was "strictly [a] communicator of messages." Plainly an attorney-client relationship cannot exist when counsel also represents one's adversary in the proceeding. (E.g., *Gonzales* v. *Municipal Court* (1977) 67 Cal.App.3d 111, 118-119 [136 Cal.Rptr. 475].)

However the record evidence conflicts as to the role of Donato. He was a retired Philippine judge, was recommended to Chuidian by Bondoc, and retained by him in July 1985. The record shows that Donato spoke for and represented Chuidian to members of the Philippine government from time to time. Philguarantee admitted that Marcos's personal attorney was Zamora. Its evidence that Donato was actually working for Marcos is not uncontradicted, and the referee in charge of discovery was entitled to find the communications between Chuidian and Donato were privileged, as he did. Chuidian's testimony was that he engaged Donato because he was a retired judge and well connected with the Marcos government, a position fully consistent with a conclusion that Donato was Chuidian's attorney but maintained communication with Marcos, as he was apparently retained to do. As a matter of law there is no error here.

## III. *Motion to Take Additional Evidence on Appeal or for Writ of Error Coram Vobis*

Philguarantee asks this court to consider new evidence on appeal (Code Civ. Proc., § 909 and Cal. Rules of Court, rule 23(b)), or alternatively to issue a writ of error *coram vobis.* Two new pieces of evidence are tendered: (1) A draft unsigned affidavit in support of a political asylum application prepared by Psinakis on behalf of Chuidian; (2) an FBI memorandum prepared by an agent at the time this lawsuit was settled. Both documents allegedly memorialize Chuidian's statements that he had boxes of incriminating evidence against Marcos regarding his holdings in or involvements

with American companies. Philguarantee contends that Chuidian suppressed these documents during discovery and that this suppression amounts to fraud such as justifies the taking of new evidence after judgment, citing *Rollins* v. *City and County of San Francisco* (1974) 37 Cal.App.3d 145 [112 Cal.Rptr. 168].

In response to the motion, Chuidian contends that Philguarantee has made an insufficient showing to warrant the requested relief, because Chuidian is not responsible for Philguarantee's failure to obtain the evidence earlier, and because in any case it is merely cumulative of evidence already in the record, and in such instance the judgment may not be reopened. Chuidian relies heavily on the decision in *Los Angeles Airways, Inc.* v. *Hughes Tool Co.* (1979) (*LAA*) 95 Cal.App.3d 1 [156 Cal.Rptr. 805], a case which he claims conflicts with *Rollins, supra,* and strictly narrows the grounds upon which a final judgment may be opened for receipt of new evidence.

First we consider the nature of the evidence tendered. The draft asylum affidavit is unsigned by Chuidian; it was prepared by Psinakis in support of an asylum application which was never actually filed. It has never been authenticated nor formally adopted by Chuidian. In it Psinakis recites that Chuidian and Marcos were working in a secret partnership and that this information would come out if the matter were ever litigated. The partnership was said to be typical of illegal schemes used by Marcos to extract and extort money from Philippine businessmen. Further it said sometime in 1980 Chuidian and Marcos entered into that secret partnership agreement by which the Marcoses became equal partners in ARCI and would invest $9,250,000 in that enterprise. The Marcoses were to be represented by their friend Betty B. Benitez. However, the Marcoses never made the investment and instead demanded profits or "kickbacks" from the company.

These same matters were testified to, at length, by Psinakis in his deposition. It is therefore immediately apparent that the unsigned and self-serving draft by Psinakis cannot bolster his credibility significantly.

Philguarantee contends that it made repeated discovery requests for this affidavit. In fact it made general requests for all documents pertinent to the subject of the litigation, which it argues encompassed this affidavit. The affidavit was finally obtained from Psinakis (not from Chuidian) in the federal litigation referred to above, and in that court was excluded from evidence because it did not qualify as an admission of a party.

The FBI memorandum was prepared by an FBI agent, also in connection with a possible asylum request by Chuidian. It says that Chuidian said he

had four boxes of evidence including tape recordings damaging to Marcos which would surface if the case were litigated. Philguarantee first made a Freedom of Information Act request to the FBI for this document in March 1987, but was unable to obtain it until the case was pending here on appeal. It contends Chuidian blocked the process by refusing to waive his rights under the act, whereas Chuidian contends Philguarantee's counsel failed to observe the requirements of the act.

At oral argument on the motion, Chuidian's counsel pointed out that Chuidian has never denied possessing material damaging to the Philippine government which would have come out in this litigation. He has taken the position that it was not illegal for him to threaten to reveal this information, a position the trial court accepted within its discretion as we have discussed above. Accordingly Chuidian now says this FBI memorandum adds nothing to the record.

 The circumstances under which an appellate court can receive new evidence after judgment, or order the trial court to do so, are very rare. For this court to take new evidence pursuant to statute (Code Civ. Proc., § 909) and court rule 23(b) (Cal. Rules of Court), the evidence normally must enable the Court of Appeal to affirm the judgment, not lead to a reversal. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 653-654 at pp. 633-635 and cases there cited; *Estate of Schluttig* (1950) 36 Cal.2d 416, 422 [224 P.2d 695]; *Kabisius* v. *Board of Playground, etc.* (1935) 4 Cal.2d 488, 494 [50 P.2d 1040]; *Tupman* v. *Haberkern* (1929) 208 Cal. 256, 269 [280 P. 970].) The power to take evidence in the Court of Appeal is never used where there is conflicting evidence in the record and substantial evidence supports the trial court's findings. (9 Witkin, *supra*, Appeal, § 657 p. 637; *Spaulding* v. *Cameron* (1952) 38 Cal.2d 265, 270 [239 P.2d 625].) Plainly the above-described evidence does not meet these tests.

 To warrant issuance of the writ of *coram vobis* commanding the trial court to consider such evidence, the standard is whether denial of the writ amounts to due process deprivation: "[I]n any attempted collateral attack based on lately discovered evidence, it is crucial to be able to demonstrate what amounts to due process deprivation: that the issue in question was really never litigated in any meaningful fashion." (*LAA, supra*, 95 Cal.App.3d at p. 7.) As the court in *LAA* in pointed out, it is not enough merely to show that there is newly discovered evidence, deliberately concealed, and material to the case. That showing is grounds for a new trial, but to find such a showing sufficient for a collateral attack would do away with legislative restrictions on the remedy of a new trial motion and extend the availability of that remedy indefinitely. (*Id.*, at p. 6.) Generally, the

court in *LAA* points out, the basis to reopen a final judgment must be extrinsic fraud, that is, such fraud as prevents a party from having a meaningful hearing on the issue in question. (*Id.,* at p. 7.)

■ Here there is no showing of extrinsic fraud. Philguarantee in addition to having stipulated, through counsel, to this judgment, has had more than one year of discovery and three days in hearing in the trial court on its motion to vacate, and in that proceeding has raised and presented evidence on the same facts presented by way of the tendered new evidence, namely, that Marcos had attempted to share in profits of ARCI and that Chuidian used that fact to his advantage in the bargaining negotiations. Even if we assume for the sake of argument that Chuidian deliberately concealed the tendered evidence or even lied about its existence, it cannot be said that such fraud amounted to extrinsic fraud preventing Philguarantee from having its day in court on the issue. To the contrary, we deal with intrinsic fraud at most, that fraud which weakens the opponent's case, as for example by perjury on the witness stand. Such fraud is not a ground to reopen a judgment. (See *LAA, supra,* 95 Cal.App.3d at p. 7; *Mullen* v. *Department of Real Estate* (1988) 204 Cal.App.3d 295, 301-302 [251 Cal.Rptr. 12].)

The court in *LAA, supra,* disagreed with the *Rollins* case, *supra,* finding the latter's issuance of the writ of *coram vobis* to be unjustified by the controlling rules of law. In *Rollins,* a wrongful death case, the court issued the writ to permit taking evidence discovered while the appeal was pending, namely, a one-page addendum to the autopsy report, supporting the plaintiff's theories of liability which formerly had no evidentiary support. In support of its use of the writ the court referred to its "rarely exercised inherent discretionary powers in the interests of justice . . . where substantial rights have been affected and a different result would have been probable if the defect had not occurred . . . ." (*Rollins, supra,* 37 Cal.App.3d at p. 150.)

We agree with the court in *LAA* that the reasoning in *Rollins* is inadequate and that as a practical matter, were that case the law, a court would have carte blanche to disregard a final judgment whenever it perceived an injustice. The traditional and more manageable test articulated in *LAA* is the requirement of extrinsic fraud preventing a full and fair hearing on the issue. Here, because the tendered evidence is plainly cumulative, that test is not met. Further, the tendered evidence does not compel or even make probable a different result, so even within the *Rollins* decision's liberal standards the writ should not issue.

In discovery matters, it may be difficult to draw a line between conduct, on the one hand, constituting a legitimate refusal to be helpful to an oppo-

nent, and on the other hand, constituting dishonest suppression of evidence. Generally speaking, discovery tactics engaged in by counsel at this stage of the proceedings are wholly within the trial court's sphere of authority, with the caveat that if counsel plainly steps over the line, the district attorney may also become involved, upon a charge of perjury. We therefore decline further exploration as to the nature of Philguarantee's attempts to obtain this evidence and Chuidian's alleged failure of cooperation which in Philguarantee's argument amounts to perjury. We hold only that (1) this evidence probably would have made no difference to the result and (2) Philguarantee has had a full opportunity to litigate its motion to vacate. Accordingly there is no ground to take additional evidence on the appeal nor to issue the writ of error *coram vobis,* and we deny the motion that we do so.

### IV. *Petition for a Writ of Mandate to Prevent Execution on the Judgment*

Philguarantee seeks a writ of mandate (or other appropriate writ) to permanently stay the trial court's order compelling it to assign to Chuidian all debts owing or to become owing to Philguarantee. The trial court granted Chuidian's motion under Code of Civil Procedure section 708.510 for an order assigning to Chuidian all Philguarantee's rights to receive monies owing to it. The order was made in aid of execution of the stipulated judgment, as to which a writ of execution in the amount of $4.4 million issued in June 1986. We temporarily stayed the order pending resolution of the appeal.

Philguarantee contends that the order violates the Foreign Sovereign Immunities Act of 1976 (FSIA). (28 U.S.C. §§ 1330, 1332(a)(2)-(4), 1391(f), 1441(d), and 1602-1611.)[1] Under the FSIA, the property of a foreign state located outside the United States is exempt from execution; assets located in the United States and used for a commercial transaction, generally speaking, may be levied on. (§§ 1609-1611.)

Philguarantee says to the best of its knowledge all its debtors are in the Philippines. Therefore it contends that the order will only be levied against assets outside the United States which are immune from execution, and therefore it is void. Chuidian concedes Philguarantee has no assets in the United States, and indeed asserted that fact as part of its showing of need for the order of assignment.

No party contests Philguarantee's status as an "agency or instrumentality of a foreign state" under the FSIA, namely, a wholly government

---

[1] Unless otherwise indicated, all further statutory references are to title 28 of the United States Code.

owned corporation formed for a governmental purpose. (See § 1603(a), (b); *Arango* v. *Guzman Travel Advisors Corp.* (5th Cir. 1980) 621 F.2d 1371; *Barragan* v. *Banco BCH* (1986) 188 Cal.App.3d 283, 293 [232 Cal.Rptr. 758].) Accordingly, it is immune from the jurisdiction of United States courts except as provided in the FSIA. (§ 1604; *Letelier* v. *Republic of Chile* (2d Cir. 1984) 748 F.2d 790, 793, cert. den, 471 U.S. 1125 [86 L.Ed.2d 273, 105 S.Ct. 2656]; *Verlinden B. V.* v. *Central Bank of Nigeria* (1983) 461 U.S. 480, 493 [76 L.Ed.2d 81, 91-92, 103 S.Ct. 1962].)

The FSIA purports to codify the "restrictive" theory of sovereign immunity pursuant to which immunity is generally restricted to a state's political acts (jure imperi) and is not extended to suits based on commercial or private acts (jure gestionis). (H.R.Rep. No. 94-1487, 2d Sess., p. 7 (1976); Comment, *The Foreign Sovereign Immunities Act: Defining Commercial Activity and Direct Effects Jurisdiction* (1985) 25 Santa Clara L.Rev. 105, 108.) As the language of the act makes plain, the act does not create immunities, but rather, creates exceptions to preexisting immunities in specified cases.[2] Beyond argument, before enactment of the FSIA in 1976, the law of sovereign immunity prescribed absolute immunity from execution upon assets of a foreign state outside the United States. (*Flota Maritima Browning de Cuba* v. *Motor Vessel Ciudad* (4th Cir. 1964) 335 F.2d 619, 626, fn. 20 and accompanying text; *Dexter & Carpenter* v. *Kunglig Jarnvagsstyrelsen* (2d Cir. 1930) 43 F.2d 705; *Jet Line Services Inc.* v. *M/N Marsa El Hariga* (D.Md.1978) 462 F.Supp. 1165, 1174, fn. 3; H.R.Rep. No. 94-1487, *supra*, at pp. 26-27, reprinted in 1976 U.S. Code Cong. & Admin. News at p. 6626; Rest.2d Foreign Relations Law (1965) § 69, pp. 215-216, citing *Weilamann* v. *Chase Manhattan Bank* (1959) 21 Misc.2d 1086 [192 N.Y.S.2d 469].)

The exceptions created by the FSIA to immunity from execution are contained in sections 1610 and 1611. Section 1610, the only arguably relevant provision, speaks only of a foreign state's property in the United States. Accordingly the statute creates no exception to immunity for property outside the United States.

---

[2] Section 1604 provides in relevant part: "[A] Foreign state shall be immune from the jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607 of this chapter." Section 1609 similarly says "the property in the United States of a foreign state shall be immune from attachment[,] arrest and execution except as provided in sections 1610 and 1611 of this chapter." The legislative history of the FSIA and the cases make plain the act leaves intact those aspects of the law of sovereign immunity not explicitly treated in the statute. (H.R.Rep. No. 94-1487, *supra*, at p. 27; *Carey* v. *National Oil Corp.* (S.D.N.Y. 1978) 453 F.Supp 1097, 1102, affd. 592 F.2d 673 (2d Cir. 1979); *Letelier* v. *Republic of Chile, supra*, 748 F.2d 790, 799, cert. den., 471 U.S. 1125 [86 L.Ed.2d 273, 105 S.Ct. 2656].)

Chuidian argued below that under the FSIA Philguarantee's property in the Philippines is not immune from execution because the exceptions to immunity, sections 1610 and 1611, do not mention property outside the United States. This argument has no support in the statute, and in his opposition lodged in this writ proceeding, Chuidian abandons that position. He admits there never has been a right to execute against assets of a foreign state or agency located outside the United States and there is no such right now; instead once a United States judgment is obtained the creditor must rely on doctrines of comity in the foreign state to have his judgment enforced there. This is the law in most, if not all, jurisdictions, as well as under the FSIA. (See discussion in *Letelier* v. *Republic of Chile, supra*, 748 F.2d at pp. 798-799.)

However, Chuidian argues that the trial court nevertheless has power to make the garnishment order for these reasons: Philguarantee waived immunity from execution; Chuidian is equitably entitled to the garnishment order; and the order is a valid exercise of the court's personal jurisdiction over Philguarantee regardless whether it will be enforceable as a practical matter in the Philippines.

We consider Chuidian's contention that Philguarantee has waived immunity from execution. Chuidian's arguments in support of that theory are as follows: that by subjecting itself to the jurisdiction of respondent court by originally bringing suit against Chuidian here, by agreeing in the stipulated judgment to be subject to suit here, by invoking this court's assistance in appealing the stipulated judgment, and finally by failing to raise the issue of sovereign immunity at the earliest possible opportunity—when the writ of execution first issued—Philguarantee waived immunity.

Philguarantee responds that the immunity goes to subject matter jurisdiction and is not waivable.

Although the FSIA states there may be implied waiver of the immunity from execution, the statute, as we have stated, does not deal with the immunity of property outside the United States. We must look to preexisting law to determine the circumstances under which this immunity may be waived.

■ The immunity of a foreign state creates a lack of subject matter jurisdiction (*Verlinden, supra*, 461 U.S. at p. 493 [76 L.Ed.2d at pp. 91-92]; see 28 U.S.C. § 1330(a)), a jurisdictional defect not normally subject to waiver. Further, immunity from suit and immunity from execution are distinct matters, and waiver of the former does not necessarily waive the

latter. (Rest.2d Foreign Relations Law, *supra*, § 69 at pp. 215-216; *Dexter & Carpenter, supra* 43 F.2d 705; *United States* v. *Crawford Enterprises, Inc.* (S.D.Tex. 1986) 643 F.Supp. 370, 382, affd. *sub nom. Petroleos Mexicanos* v. *Crawford Enterprises, Inc* (5th Cir. 1987) 826 F.2d 392; *Canadian Overseas Ores Ltd.* v. *Compania, etc.* (S.D.N.Y. 1982) 528 F.Supp. 1337, affd. (2d Cir. 1984) 727 F.2d 274; *Letelier* v. *Republic of Chile, supra*, 748 F.2d at p. 798; see also *United States of Mexico* v. *Rask* (1931) 118 Cal.App. 21, 33 [4 P.2d 981].) Although immunity from personal jurisdiction may be waived by not objecting at the first available opportunity (*Barragan* v. *Banco BCH, supra*, 188 Cal.App.3d at p. 293), sovereign immunity from execution, unlike immunity from personal jurisdiction, is in the nature of an objection to subject matter jurisdiction and is ordinarily not waivable. (*Raji* v. *Bank Sepah-Iran* (1985) 131 Misc.2d 158 [495 N.Y.S.2d 576, 581].) it has been observed that subject matter jurisdiction under the FSIA is not waived by untimeliness, delay, or dilatory conduct. (*Ohntrup* v. *Firearms Center Inc.* (E.D.Pa. 1981) 516 F.Supp. 1281, 1284, affd. (3d Cir. 1985) 760 F.2d 259.)

We conclude the immunity in question is not waivable and therefore we need not consider whether Philguarantee's conduct in this litigation amounts to waiver.

Chuidian next argues there can be no right without a remedy; there would be no point in holding that personal jurisdiction exists (because immunity has been waived, or for other reasons) and then finding that immunity to execution nevertheless existed. However, that equitable argument has been rejected in *Letelier* v. *Republic of Chile, supra*, 748 F.2d 790, a decision pointing out that the FSIA, and the House Report containing its legislative history, emphasize the two kinds of immunity are not co-extensive, even though as in the *Letelier* case itself that interpretation can result in the existence of a right without a remedy.

In *Letelier,* it was held plaintiffs had a right to obtain a judgment against Chile and its national airline for the assassination of an ambassador, but no right to execute that judgment against assets of the airline because the exception to jurisdictional immunity based on the commission of a tort here did not parallel the exception to immunity from execution. The immunity from execution required that the property to be levied on be used in a commercial activity relevant to the claim. Assassination was held not a commercial activity for these purposes. The *Letelier* court pointed out that although the particular remedy of execution was unavailable, that did not necessarily mean there was *no* remedy, since enforcement in an international court, appeal to the courts of Chile, or similar possible avenues might

exist; but even if there were indeed no remedy, that result was a congressional choice which binds the courts.

Similarly, in *Crawford Enterprises, supra*, 643 F.Supp. 370, although Pemex had waived foreign sovereign immunity from suit, and was in contempt of court for disobeying discovery orders, it was nevertheless agreed a judgment could not be executed against Pemex in Mexico, because the FSIA provides only for execution against property of a foreign state in the United States. (*Id.*, at p. 382.) (Other sanctions were, however, imposed against Pemex in connection with litigation it had brought in the court.) *Raji, supra*, is to the same effect: a judgment under the FSIA cannot be enforced against property outside the United States. The court said any unfairness in this scheme has been congressionally determined to be outweighed by national and foreign policy considerations.

■■■ Although Philguarantee says none of its property is subject to execution, we disagree and hold that there may be execution on Philguarantee's property located in the United States and related to commercial activity here. Philguarantee says it is a governmental corporation created to assist the development of Philippine business and is not engaged in commercial activity. It says the essential nature of its activity is governmental—to promote growth in the Philippine economy by providing guarantees of export industry loans. None of the loan proceeds were ever intended to leave the Philippines. Particularly, it says it is not engaged in commercial activity in the United States, as the statute requires. All it has done in the United States is to bring suit against Chuidian.

In this respect, however, Chuidian properly points out the test of whether activity is commercial is broad and does not depend on whether a governmental purpose motivates the activity. Rather, if the activity is of the sort normally undertaken by private persons, and is not permeated with a political purpose, it will be deemed commercial. (See extensive discussion in *Letelier* v. *Republic of Chile, supra*, 748 F.2d at pp. 796-797.) The Senate Report referring to the FSIA stated that an activity would be characterized commercial when it "is customarily carried on for profit." (Sen.Rep. No. 94-1310, 2d Sess. (1976) [cited in *Letelier* at p. 796].) That report gave as examples of commercial activities "Activities such as a foreign government's sale of a service or product, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents or its investment in a security of an American corporation . . . ." (*Ibid.*) Under these principles, Philguarantee's activity in guaranteeing loans to help start up semiconductor businesses would most properly be classified as commercial activity.

Chuidian's argument in the trial court was mistakenly based on the statute controlling immunity from personal jurisdiction, section 1605(a)(2), which applies an "effects" test and finds a jurisdictional basis in commercial acts outside the United States which cause a direct effect here. However, the "effects" test does not apply to execution under section 1610. That statute provides an exception to execution immunity for property in the United States of an agency of a foreign state engaged in commercial activity in the United States. (§ 1610(b).) Nevertheless, as stated, under a proper analysis Philguarantee's activity relevant to this lawsuit is commercial, and therefore there is a legal basis for execution against property in the United States. It is the property located in the Philippines which presents a problem.

Philguarantee contends that the very settlement agreement Chuidian is trying to enforce here has international implications, implying that the act of state doctrine or a related principle precludes interference by an American court. Chuidian's ties to the Marcos regime are being investigated by the present Philippine government. Philguarantee attempted to vacate the settlement on the basis it was compelled by Marcos to enter into it. Further, the Philippine Commission on Audit, an agency of the government, on March 13, 1986, ordered that no payments be made to Chuidian on the settlement agreement. It was found that agreement was "manifestly and grossly disadvantageous to the Government." Any violation of that order is punishable by administrative and criminal sanctions. Accordingly Philguarantee claims to be in the untenable position of being in contempt of its own government if it obeys this court; in contempt of the Santa Clara County Superior Court if it does not. Principles of international comity militate against placing foreign nationals in such a dilemma. (*Volkswagenwerk Aktiengesellschaft* v. *Superior Court* (1981) 123 Cal.App.3d 840, 857 [176 Cal.Rptr. 874]; see Rest., Foreign Relations Law (rev.) (Tent. Draft No. 3, 1982) § 419, subd. (1).)

The act of state doctrine is a judicially created doctrine treating as nonjusticiable claims that challenge certain acts of foreign sovereigns, where judicial resolution of such claims may embarrass United States foreign policy or otherwise intrude upon the legitimate domain of the executive branch of government. (*Allied Bank Intern.* v. *Banco Credito Agricola* (2d Cir. 1985) 757 F.2d 516, 520 [77 A.L.R.Fed. 281]; *Banco Nacional de Cuba* v. *Sabbatino* (1964) 376 U.S. 398, 428 [11 L.Ed.2d 804, 823-834, 84 S.Ct. 923].) Normally the doctrine does not bar inquiry as to the validity of extraterritorial takings. (*Ibid.*; *Banco Nacional de Cuba* v. *Chemical Bank New York* (2d Cir. 1981) 658 F.2d 903, 908; see also the cases denying sovereign immunity to the Marcoses in connection with their business investments here, cited *ante*, p. 1075.) Here, Chuidian argues, he is attempt-

ing to collect on a United States judgment, based on an underlying obligation owing in this jurisdiction; hence the act of state doctrine does not prevent examination of the validity of his claim. We inferentially accepted this argument when we denied a writ to Philguarantee in an earlier proceeding in which it challenged on the basis of the act of state doctrine the court's power to compel its obedience to the judgment. In that matter, we also sought the advice of the Department of State as to whether it had a position; it did not respond, a factor relevant to our determination. (See *First Nat. City Bk.* v. *Banco Nacional de Cuba* (1972) 406 U.S. 759, 767-770 [32 L.Ed.2d 466, 482-484, 92 S.Ct. 1808].) We agree with Chuidian that the act of state doctrine does not provide immunity for Philguarantee regarding any United States assets it may have.

Regarding Philguarantee's claim of governmental compulsion, we have already addressed that point in considering the claim of duress, and have observed that precedent holds one in Philguarantee's position cannot claim to be coerced by the very government of which it is a part, because such a claim is essentially a claim of self-coercion and if accepted leads to governmental repudiation of its just debts because of a change of political power. (See *Alfred Dunhill of London, Inc.* v. *Cuba, supra,* 425 U.S. 682, 695 [48 L.Ed.2d 301, 311-312].)

We turn to Chuidian's argument that the garnishment order is a valid exercise of personal jurisdiction over Philguarantee and that he is entitled to it regardless of its practical effect. The heart of Chuidian's position is that the trial court concededly has personal jurisdiction over Philguarantee. One of its powers is to order Philguarantee to obey its valid commands; such orders may be enforced in any legitimate manner, although execution against Philguarantee's Philippine assets is not such a manner. Here, the trial court has ordered Philguarantee to assign debts to Chuidian; that order, Chuidian argues, is not execution on any assets, but simply an exercise of personal jurisdiction. If Philguarantee disobeys, sanctions may be imposed against it even though execution is unavailable, as in the *Pemex* litigation discussed above.

The parties cite no case considering, in the context of international law principles, the issue whether an order to assign assets in a judgment debtor proceeding is an exercise of the court's personal jurisdiction over the debtor or is an execution upon the judgment. Examined narrowly in a vacuum, the court's order under Code of Civil Procedure section 708.510 to assign debts to the judgment creditor is a simple exercise of power over the debtor, an injunction or command, presupposing personal jurisdiction. It is not an action in rem, as a levy of execution of a judgment against a tangible

asset. However, to examine the order thus narrowly is unrealistic because the order is authorized under a statutory scheme in aid of execution, and its sole purpose is to permit execution upon the debtor's property. For that reason, the limits which generally exist upon the right to execute—most notably the exemptions of certain assets from execution—apply in a judgment debtor proceeding such as this and prevent the court, for instance, from ordering the debtor to assign exempt property to the judgment creditor. (See Legis. Com. com., Assembly, 1982 Addition, to West's Ann. Code Civ. Proc. (1987 ed.) § 708.510 (Deering's Ann. Code Civ. Proc. § 708.510 (1983) pp. 537-538): "This section does not make any property assignable that is not already assignable. . . . [¶] Subdivisions (e) and (f) recognize limitations on the assignment order procedure imposed by exemption laws"; see also 30 Cal.Jur.3d, Enforcement of Judgments, § 262, p. 286, stating a debtor may claim all exemptions in judgment debtor proceedings, citing § 708.120, subd. (d); see also 30 Cal.Jur.3d, Enforcement of Judgments, § 278, p. 304.) If the debtor may not be ordered to assign exempt property, should not assets which are immune from execution under international law, such as property of a foreign state located outside the United States, be similarly immune? To hold otherwise would be to ignore a longstanding immunity of international law and under the FSIA and to provide the creditor that which he could not straightforwardly achieve through ordinary creditors' remedies, namely, execution upon foreign property; for once he is armed with Philguarantee's signature assigning over the latter's debts, the creditor may simply go into the Philippines and collect from these people. Unless a debtor refuses to pay, collection will result immediately without the creditor having to submit his claim to a Philippine court. Such a result evades the rule of international law, and does so on the basis of the technical circumstance that the order to assign debts is not itself a levy, even though to levy on the debtor's property is indeed its only purpose.

From these principles we deduce the following rules of law. First, Philguarantee's assets located in the Philippines are immune from execution. Second, its assets located in the United States, if any, are not immune because they relate to commercial transactions within the FSIA. Third, the court in aid of execution of this judgment may order Philguarantee to assign only such assets as Chuidian may legally execute upon in satisfaction of the judgment. It follows, therefore, that the trial court's order is too broad because it is not restricted to debtors who reside in the United States. Accordingly the order should be modified, and we do modify it, by issuing the writ of mandate to limit the order in aid of execution to an order compelling Philguarantee to assign to Chuidian all debts owing or to be-

come owing to Philguarantee from individuals or entities located in the United States. Any broader order would not be justified under the FSIA.

## DISPOSITION

The judgment of the trial court denying the motion to vacate the judgment is affirmed. The motion to produce additional evidence on appeal or for a writ of error *coram vobis* is denied. The petition for a writ of mandate is granted and a writ is issued commanding the trial court to modify its order in aid of execution to an order compelling Philguarantee to assign to Chuidian all debts owing or to become owing to Philguarantee from individuals or entities located in the United States. Our temporary stay of the original order in aid of execution shall remain and become permanent. All parties shall bear their own costs in all matters here decided.

Agliano, P. J., and Fogel, J.,* concurred.

**FOGEL, J.***—I concur fully with Justice Cottle's thorough and well-reasoned opinion. I write separately only for the purpose of acknowledging the larger context in which this matter has arisen.

There is an injustice in this case: the Philippine people have lost $25 million because of the questionable business dealings of their government under former President Marcos. It is understandable that the present government of the Philippines is seeking to recover what it can of that loss.

However, for the reasons set forth in the lead opinion, appellant's motion to set aside the stipulated judgment cannot be the vehicle for accomplishing that result. The Philippine government, under orders from Marcos, entered into a contract to resolve a dispute. That contract was merged into a judgment, raising the standard required to set it aside. (See *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1071 [202 Cal Rptr. 116].) A conscientious and experienced trial judge heard numerous witnesses and reviewed voluminous documentary evidence as to the circumstances under which that contract and judgment were obtained and determined that appellant had not met its burden of proof for setting the judgment aside. We are bound by the trial court's factual determinations because they are supported by substantial evidence.

Changes in government occur almost daily in these turbulent and historic times. Some states and nations have been blessed with a succession of

---

* Assigned by the Chairperson of the Judicial Council.

leaders who are basically honest and ethical; most have not been so fortunate. In the Philippines, Eastern Europe and elsewhere, people have demanded democratic and accountable leadership. One can only applaud a new government for attempting to undo the wrongs of the corrupt one it has replaced.

But a change of government, even a salutary one, in and of itself cannot be the basis for abrogating contracts and judgments, however unwise or unfortunate, to which a state or nation has become a party, any more than a corporation can abrogate agreements made by a deposed board of directors acting within its actual or apparent authority. (*Alfred Dunhill of London, Inc.* v. *Cuba* (1976) 425 U.S. 682, 695 [48 L.Ed.2d 301, 311-312, 96 S.Ct. 1854]; Corp. Code, § 208, subds. (b) and (c).) If there is to be a remedy for the injustice this case reveals, it must be through whatever actions remain available against Marcos's estate here and in the Philippines, not in discarding established principles of contract law, the law of judgments and appellate review.

A petition for a rehearing was denied April 13, 1990, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 7, 1990.